[No. S014200. Aug. 4, 2005.]

THE PEOPLE, Plaintiff and Respondent, v.
JON SCOTT DUNKLE, Defendant and Appellant.

## COUNSEL

S. Michelle May and Conrad Petermann, under appointments by the Supreme Court, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Ronald S. Matthias and René A. Chacon, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KENNARD, J.**—A jury convicted defendant Jon Scott Dunkle of the first degree murders of 15-year-old John Davies and 12-year-old Lance Turner, finding true a multiple-murder special-circumstance allegation and weapon-use enhancement allegations. (Pen. Code, §§ 187, 190.2, subd. (a)(3), 12022, subd. (b).)[1] After a penalty trial, the same jury returned a verdict of death. This appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment.

## I. FACTS

### A. *Guilt Phase*

#### 1. *Disappearance of John Davies*

In November 1981, defendant, then 21 years old, was a close friend of the Davies family, who lived in Belmont. He often visited the Davies residence and spent time with 17-year-old Mark Davies and his 15-year-old brother John. On the morning of Sunday, November 8, 1981, James Davies called the police to report his son John missing. Davies and his wife, Joan, had returned

---

[1] Unless otherwise specified, further statutory references are to the Penal Code.

home around 1:30 a.m. and had noticed nothing amiss. Joan had found John missing when she opened his bedroom door sometime after 8:30 a.m. John had laid out his church clothes and had left behind all his possessions, including his only pair of shoes. He usually informed his parents of his whereabouts and, according to them, was not the sort of child who would be expected to run away. James and Joan Davies unsuccessfully made extensive efforts to locate John for several years after he disappeared.

Soon after the disappearance, James Davies called defendant to come over and help post flyers describing John. Defendant came over on the Wednesday or Thursday after the Sunday John was reported missing, and left with some flyers. He never visited the Davies family again.

Mark Davies testified that before John disappeared, defendant would come by the Davies residence in his white Honda automobile. If he came to visit in the evening, he would throw rocks at Mark's window so Mark could sneak out of the house without his parents' knowledge. They would drive to the Hassler Hospital site off Woodside Road and Highway 280 to explore the partially abandoned grounds. Mark last saw his brother John on Saturday, November 7, about 10:30 p.m., when Mark went to bed. Mark never heard from defendant after John's disappearance.

Joan Davies testified that when defendant visited her sons, they would often sit in defendant's car listening to music.

Initially, police theorized John had run away. Belmont Police Detective Jerrold Whaley contacted defendant in mid-1982, and defendant told him where John liked to hang out. Because the Davies family reported that defendant was John's closest friend, Whaley contacted defendant often. By September 1984 the police were treating the disappearance as a possible kidnapping and had contacted the Federal Bureau of Investigation (FBI) for assistance. On December 4, 1984, Whaley and FBI Agent Robert Deklinski twice interviewed defendant at his residence near Sacramento. In the first interview, defendant denied seeing John on Saturday, November 7, 1981, claiming he did not leave his parents' home that evening, and denied ever throwing rocks to summon Mark or John and sitting in his car listening to music with John. In the second interview, Whaley and Deklinski probed the discrepancies between the Davies family members' and defendant's accounts; defendant was emphatic that he had neither thrown rocks at the boys' bedroom windows nor listened to music with John in his car. Defendant also denied he had ever traveled with John to a hangout he called the "morgue," evidently the Hassler Hospital grounds.

### 2. *Murder of Lance Turner*

On October 2, 1984, about 7:00 p.m., Belmont resident Margaret Turner called the police to report her 12-year-old son, Lance, missing from soccer practice. That day, Timothy O'Brien had driven his two sons and Lance to soccer practice at the fields behind Ralston Intermediate School. O'Brien began coaching his team and did not see Lance again. Later, when the practice ended, O'Brien asked Lance's coach, Ray Williamson, where Lance was. Williamson told him Lance was not at practice that day. Several boys reported seeing Lance head toward Waterdog Lake, three-eighths of a mile from the soccer field. A search followed.

William Russell arrived at 6:00 p.m. to pick up his son from soccer practice and, after taking his son home, joined the search for Lance. About 8:20 p.m., Russell shined a flashlight onto some bushes in a gully off the path to Waterdog Lake and saw feet sticking out of the bushes. Lance's body was found under the overgrown brush.

Pathologist Peter Benson, M.D., testified Lance had died from blood loss due to multiple stab wounds. Two wounds to the heart were each fatal; two other wounds to the lungs were potentially life threatening. There were numerous defensive wounds to the arms and hands, as well as scratches, scrapes and bruises.

Stephanie Olson, Kendra Durham, and Nicole Guthrie, students at Ralston Intermediate School at the time of the Turner homicide, testified that about 3:00 p.m. on October 2, 1984, they left school, skipping volleyball practice, and went down to Waterdog Lake to smoke cigarettes. A man whom Stephanie described as having dirty blond hair, pimples, and dirty teeth with a retainer approached them and started a conversation. He told them his name was Jon and said he had graduated from Carlmont High School the year before. He was drinking beer from a tall Budweiser can, which he offered to the girls. The girls left after about 20 minutes. Another Ralston student saw a man with dirty blond hair near Waterdog Lake about 4:00 p.m. (None of these witnesses was asked to identify defendant in the courtroom. Olson, Durham and Guthrie gave the police a description of the man that was incorporated into a composite drawing used in the investigation of the Turner homicide. As discussed below [*post*, at p. 874], in his confession to FBI agents, defendant described talking with the three girls shortly before he killed Turner.)

### 3. *Investigation of Davies and Turner murders*

On December 27, 1984, Belmont Police Detective Sergeant James Goulart interviewed defendant concerning the Turner homicide. Defendant was by

then the only suspect in the crime. Detective Goulart advised him of his constitutional rights, and he agreed to speak with Goulart. Defendant denied having been at Waterdog Lake on October 2, 1984, claiming he had been at home until noon and then had gone to stores in Redwood City to fill out employment applications, returning home by bus at 4:30 p.m. Later police contacts with those businesses turned up no such applications.

In January 1985, in an effort to gather information about the Turner homicide, Belmont Police Officer Lisa Thomas began working undercover at the Sacramento Carl's Jr. restaurant where defendant was employed. There she encountered defendant several days a week, regularly visited him at his sister's house, where he was residing, and sometimes went to a bar or movie with him. Defendant often spoke with Thomas about newspaper reports on the investigations, at one point showing her a collection of clippings. On February 9, 1985, defendant told her the police and the FBI had been in his home for five hours, confronting him, and that he had lied to them. To Thomas, he maintained his innocence, claiming that on the day Turner was killed he had gone to Redwood City to fill out job applications. Defendant seemed impressed with the attention he was getting from the FBI.

In May 1986, James and Joan Davies met with defendant for several hours seeking information about John. Defendant said he had none. Joan Davies met with defendant again in July 1986, and he continued to insist he had no information.

On September 16, 1986, Charles Rice told Michael Wiley, a law enforcement investigator for the State of California, that defendant had admitted to killing John Davies and Lance Turner. (During the penalty phase, the jury was informed that Rice was defendant's cellmate at the state prison in San Luis Obispo on that date. Defendant was then incarcerated on a burglary conviction arising out of an incident, discussed *post*, at pages 921–923, in connection with a related appellate contention.) Wiley testified that Rice voluntarily made a statement, asking nothing in return, and insisted on trying to obtain further information from defendant because he was appalled by the killings. On September 22, 1986, Rice gave investigators two maps, drawn by defendant, of the crime scenes. A week later, defendant met with Rice, who was wearing a wireless transmitter, and described the Davies and Turner murders in graphic detail. Defendant refused to report the crimes to the Belmont police because he did not trust them. He said he did trust the FBI, however, so Rice told defendant he had a friend who was an FBI agent and would help defendant if he confessed to him. Prison officials arranged to find an FBI agent to take the confession.

On October 3, 1986, FBI Special Agents Frank Hickey and Daniel Payne interviewed defendant at the state prison in San Luis Obispo. Rice was also present. Defendant was advised of his constitutional rights and signed a waiver.

Defendant stated that, before killing John Davies, he was at Half Moon Bay with three friends, drinking whisky and smoking marijuana. He then drove to the Davies residence, parked a few doors down the street, and entered through an unlocked door. He went to John's bedroom and invited him to come and drink beer. John agreed, and went with defendant to Edgewood Park in Redwood City near the Crystal Springs Reservoir. John was wearing a black T-shirt, blue corduroy pants and no socks or shoes. Defendant parked near a shooting range and, before leaving the car, removed a knife from the glove compartment. At that point, he "committed" himself to killing John. They walked half a mile to two miles down a dirt road. Defendant then stabbed John in the back, sat on his chest and stabbed him in the throat. When John struggled, defendant picked up a large rock and struck him in the head. Defendant then dragged the body to an opening in the ground, pushed it in and left the scene, later disposing of his bloodstained clothing. A week after the murder, defendant returned to the area and observed that the body was bloated and animals were feeding on it. In May 1984, he returned again and observed a skull.

Asked about a motive for killing John Davies, defendant said that when he drank beer and smoked marijuana he became aggressive. He also noted that John used to cause a computer monitor to flash irritating statements that defendant would observe, and this angered him. Defendant drew a map for the investigators illustrating the location of John's remains.

Regarding the murder of Lance Turner, defendant stated that on October 2, 1984, he was in the process of moving from Belmont to another part of the state. On that day, he bought a six-pack of beer and went to the park near Waterdog Lake to drink it. At 2:30 p.m., after some three hours at the lake, he went to an area near Ralston School. He climbed a tree known as the "smokers' tree" and used his buck-type hunting knife to stab at it. Three junior-high-school-age girls came to the tree looking for a pack of cigarettes and dug up a matchbook with a distinctive inscription. The girls shared defendant's last beer and one of them offered him a marijuana cigarette. At one point defendant saw a boy wearing athletic clothes run down the hill.

After the girls left, defendant stayed for another five minutes. Then, as he headed back toward the dock, he saw the boy jogging in the area. To get his attention, defendant asked him the time. The boy responded that it was 3:50, and turned away. As he turned, defendant stabbed him in the side with his

hunting knife. The boy struggled as defendant stabbed him a second time, then went down to the ground and complied with defendant's command to put his leg down. In the course of the struggle, the boy bit defendant so severely on the thumb that he later lost the nail. Defendant stabbed him again, in the throat, and yet a fourth time near the heart. The boy then appeared dead. Defendant moved the body under some low bushes and went home. He later disposed of the knife and sheath in separate places and discarded his shoes out of concern that their prints could be identified. He correctly described a birthmark on the side of the boy's neck.

Using a map defendant had drawn, Belmont police searched for John Davies's remains and found items of clothing, bones and a skull. A forensic pathologist who examined the skull testified it was consistent with that of a young Caucasian male and bore evidence of blunt force trauma that could have been inflicted by a rock. Orthodontist Stan Wolken compared X-rays of his patient, John Davies, with X-rays of the remains, finding similarities between them.

On October 6, 1984, defendant led investigators into a field near a Carmichael residence and pointed out the shrubbery where he had discarded the knife he had used to kill Lance Turner. With the help of a metal detector, investigators found a folding Puma brand knife.

On two occasions in October 1986, for 45 minutes and five hours respectively, Psychiatrist James Missett, met with defendant at the request of the district attorney's office. Dr. Missett read defendant his constitutional rights at the outset of each interview and defendant waived them. Defendant described having an interest in reading newspaper accounts of killings when he was in elementary school. He stopped doing so in fifth grade because "homicides weren't part of my everyday scene." In sixth grade, defendant became aware that he wanted to kill someone after watching a movie in which an older boy was about to kill a younger boy to prevent him from disclosing a diary containing references to other murders. About the Davies murder, defendant said: "I thought to myself[,] you have got someone out in the middle of nowhere, here is your chance to kill someone. You have thought of killing someone before." After describing how he initially stabbed Davies, defendant told Dr. Missett he pinned Davies down with his knees on his shoulders and, when Davies asked what he planned to do, defendant said he was going to kill him. He told Davies to scream all he wanted before stabbing him in the throat and strangling him with his hands. Defendant said he stopped to think whether he wanted to go through with it before he picked up a rock and hit Davies three times on the right side of the head.

B. *Penalty Phase*

### 1. *Prosecution case in aggravation*

The prosecution introduced evidence that defendant had attempted, in separate incidents, to kill Steve Murphy and Monte Hansen, and had murdered Sean Dannehl. The prosecution also presented evidence, described below in connection with related contentions (see *post*, at pp. 918–920), of defendant's threat to kill jail nurse Angela Beck and his burglary of the home of Richard Rennie.

#### a. *Attempted murder of Steve Murphy*

On November 5, 1982, 16-year-old Steve Murphy attended a party at a friend's house in San Mateo. Leaving the party around 11:30 p.m., he walked another friend home. Murphy was heading toward his own residence, 15 to 20 houses away, when he lost consciousness. He awoke after daylight the next morning near a large dirt area surrounded by trees. He fell unconscious again and next woke up in a hospital, discovering that his spleen and a kidney had been surgically removed. He spent the next three weeks in the hospital with broken ribs and a broken pelvis. His injuries caused him to miss several months of school.

In October 1986, after obtaining a waiver of constitutional rights, Belmont Police Officer Joseph Farmer spoke with defendant about the assault on Murphy. Defendant admitted he had been drinking alcohol on the beach before driving his car up the hill on 42d Avenue in San Mateo. He saw someone walking on 42d Avenue and made two or three right turns to encounter the person again. He deliberately ran over the person, put him in the back of his car, and drove him to an isolated area in Belmont at the Marburger turnaround. He took the person out of the car and laid him on the roadway. Defendant referred to the person as "Steve Murphy," but did not explain how he had learned the victim's name.

#### b. *Attempted murder of Monte Hansen*

In 1982, Monte Hansen, then 16 years old, often went out drinking with defendant. On New Year's Eve that year, Hansen invited defendant to come to his house, as his parents were out. Defendant arrived shortly before midnight, apparently under the influence of alcohol, and told Hansen he felt dizzy. Hansen told him to drink some water and went out into the backyard to smoke a cigarette. There, he turned to observe defendant approaching him, a two-by-four-inch board studded with nails in his raised hand. Defendant struck at Hansen with the board. One blow hit him in the head, but Hansen

blocked the rest of the blows with his forearm. Defendant was smiling as he attacked Hansen. Defendant then reentered the house and Hansen saw him put a knife back in a kitchen cabinet. Hansen screamed at defendant to get out and told defendant he would kill him if he harmed his little brother, who was asleep in a bedroom. Defendant ran toward his car and Hansen never saw him again.

On February 28, 1985, undercover officer Lisa Thomas told defendant a false story about her involvement in a hit-and-run accident. Defendant then told her how he had run over Steve Murphy and assaulted Monte Hansen; a recording of the conversation was played for the jury.

### c. *Murder of Sean Dannehl*

Around 6:00 p.m. on July 2, 1985, 12-year-old Sean Dannehl went to a friend's house in Sacramento, riding his bicycle. When he did not return home by 9:00 p.m., his mother called the friend's house and learned Sean had left around 7:30. His father and mother and her husband searched for him. His body was found six days later at Lower Sunrise Park. A board with a nail in it and a beer can were found at the scene.

An autopsy revealed the cause of death to be two stab wounds to the heart, one penetrating a rib, caused by something thick, pointed and dense, consistent with a marijuana pipe tool. Sean also suffered a perforating wound to the skull consistent with the nail-embedded board. Insect activity in the facial and neck area also suggested the presence of some type of wound there.

Sacramento Detective Robert Bell questioned defendant on July 5, 1985. Defendant said he did not know about the missing boy, but he admitted that on July 2 he was on a bicycle trail at Lower Sunrise Park drinking beer with friends until about 8:30 p.m., when he rode home. He claimed a flat tire prevented him from arriving at home before 10:00 p.m. Anton Martinez and Paul Stanley confirmed they were on the bicycle trail with defendant that day, drinking beer and smoking marijuana until they parted around sunset.

After Sean's body was found, Detective Bell contacted defendant, who agreed to accompany investigators to the police station. After waiving his constitutional rights, defendant denied knowing anything about Sean's murder. Investigators drove defendant to his sister's residence, where he was staying. Defendant and his sister agreed to a search of the house; no evidence was found.

Defendant later voluntarily returned to the police station to provide hair, blood and saliva samples. The next day, July 10, 1985, defendant showed

Detective Bell where on the bicycle trail he had had a flat tire and where he and his friends had met to drink beer. Defendant also assisted investigators in searching for his missing marijuana pipe tool, accompanying them to several smoke shops and finding one tool he said resembled the one he had lost. On July 15, 1985, defendant telephoned Detective Bell to tell him Paul Stanley's blood might be found on his (defendant's) bicycle because Stanley had fallen and might have bled on it.

On August 19, 1985, in an effort to get defendant to confess, undercover narcotics officer Ronald Goesch, posing as "Ron Cross," left a letter at defendant's house. The letter advised that Cross lived near the river, the police were pressuring him, and he knew what defendant had done and would be communicating with him again. Defendant gave the letter to Detective Bell. Officer Goesch left another letter and called defendant four days later, asking to meet with him. Goesch said he knew about "the board" and "other stuff," and wanted money or he would go to the police and give them evidence, adding that he needed the money to avoid his own arrest. Defendant did not respond and did not appear at the time Goesch requested.

After investigators questioned defendant about the Ron Cross information, defendant telephoned Detective Bell, upset at the course of the investigation. In the course of the conversation, defendant asked, hypothetically, what might happen if he confessed to the crime. He also asked, hypothetically, if he were at the scene, saw the victim screaming and took no action to save him, whether his inaction would get him in trouble.

Department of Corrections Sergeant Michael Wiley took Charles Rice's report of defendant's confessions. On September 28, 1986, in Wiley's office, Wiley overheard defendant describe to Rice, who was wearing a wireless microphone, the murders of Lance Turner, John Davies and Sean Dannehl.

On October 3, 1986, following defendant's agreement to confess to the murders to the FBI (see *ante*, at p. 874), FBI Special Agents Frank Hickey and Daniel Payne asked defendant about the Dannehl murder. Charles Rice was also present during the interview. Defendant stated that on July 2, 1985, he had left his home at 11:30 a.m. and ridden his bicycle to the American River Park, where he met an acquaintance, Anton. They bought some beer and went to Anton's house, where another friend met them. The three rode their bicycles back to the park and smoked marijuana and continued to drink beer. Defendant drank four tall beers and three 12-ounce cans of beer. About 8:30 p.m. they parted, and defendant rode his bicycle to a vista point. He saw Sean Dannehl riding his bicycle towards Sunrise Boulevard, commenting to Agent Hickey, "I knew right then I was going to stop him and kill him." He chased after Sean, ramming Sean's bicycle with his own. When Sean fell off

his bicycle, defendant grabbed his arm and led him to a large tree. Sean cooperated, causing defendant to want to humiliate him, over Sean's pleas that defendant not hurt him. Defendant forced Sean to take off his clothes and put them in a pile. A two-by-four lay in the area; defendant put it over Sean's eyes as he lay on his back. Defendant was carrying an electrician's instrument with a pick, which he thrust into Sean's chest, near his heart. After Sean protested that defendant had promised not to hurt him, defendant put a hand over his mouth and stabbed him again, causing the blade of the instrument to separate from the handle. Defendant retrieved the blade, screwed it back into the handle and stabbed Sean in the eyes. He then rode his bicycle home, removing the handle from the pick along the way and discarding the pieces separately. At home, defendant washed his clothes and buried his bloody socks in a flowerbed near a library three blocks from his house. He signed a written statement incorporating his confession, drew a map of the crime scene, and gave investigators a sketch of his pick tool.

### 2. *Defense case in mitigation*

The defense presented the testimony of a forensic psychiatrist, George Wilkinson, M.D., who had been appointed by the court on two occasions to evaluate defendant's competency to stand trial. Dr. Wilkinson had reviewed records of defendant's treatment in correctional mental health facilities, as well as police and school reports, and testified regarding his observations of defendant's behavior, personality and thought processes, his diagnoses of defendant's mental condition, and his conclusions regarding how that condition had worsened over the two years during which he performed his evaluations.

Based on his initial evaluation in 1987, Dr. Wilkinson believed defendant was not psychotic but had experienced psychotic episodes in the past; also, he was manipulative and malingering to some degree. Accordingly, Dr. Wilkinson diagnosed defendant as having antisocial personality disorder with transient psychotic episodes. Later contacts with defendant, who by then was relating obviously delusional thoughts and engaging in bizarre behavior, caused Dr. Wilkinson to alter his diagnosis to paranoid schizophrenia with antisocial personality traits. Dr. Wilkinson estimated defendant's intelligence quotient to be low normal, or no higher than 90.

By judicial notice, the jury was informed that the defense in this case had never entered a plea of not guilty by reason of insanity.

### 3. *Rebuttal*

Psychiatrist James Missett, testified that in October 1986 he examined defendant on two occasions after obtaining a waiver of constitutional rights.

Defendant acknowledged that before he killed John Davies he had long wondered what it would be like to kill another human being. Dr. Missett noted that defendant's mental processes after the Davies homicide were clear enough to enable him to take steps to avoid being caught, such as washing up and disposing of his bloodstained clothing and denying any knowledge of John's whereabouts to the Davies family. Dr. Missett diagnosed defendant as having, at the time of all three murders and since, a mixed personality disorder with antisocial, borderline and narcissistic traits, and sexual sadism. He saw no evidence to support a diagnosis of paranoid schizophrenia.

Dr. Missett observed defendant during a May 1988 competency trial and interviewed him to evaluate his competency in July 1989 (see *post*, at pp. 881–882, concerning events leading to the competency proceedings), at which time defendant appeared to be consciously feigning mental illness. Although at times defendant gave candid and straightforward responses, at other times he disrupted the interview with gibberish and refused to discuss details of the killings. At one point he smiled at and maintained eye contact with Dr. Missett, unlike true schizophrenics, who characteristically are withdrawn. Dr. Missett concluded defendant had "a little mental illness . . . and a lot of malingering."

Dr. Missett characterized defendant's behavior toward him and defense counsel, as well as defendant's three murders and other assaults, as involving his hating and acting contemptuously towards persons he also in some way liked, respected or admired. Although defendant's attraction to and hatred of prepubescent boys were outside his control, his devious planning and avoidance of detection for long stretches of time were within his control. To Dr. Missett, defendant's criminal conduct reflected innate evil rather than mental illness.

Dr. Missett offered no explanation for why defendant could ingest near-maximum doses of antipsychotic medications and display none of the sleepiness that would be expected if he were merely malingering.

### 4. *Surrebuttal*

In lieu of testimony, the jury heard the parties' stipulation that, if he were called to testify, Defense Counsel Douglas Gray would state that he was first appointed in July 1988, defendant having previously been represented by other attorneys; that from July to September 1988 defendant cooperated with Gray and discussed various aspects of the case with him; that from September 1988 through April 1989 defendant refused to cooperate with Gray by refusing to meet or discuss the case with him; that in April 1989 defendant began to cooperate with him selectively but still refused to discuss certain

topics such as penalty and legal issues; that after a competency trial and during the trial of the offenses defendant refused to cooperate with him; that on several occasions in open court defendant expressed a desire to plead guilty to the charges; and that no such plea had been entered on his behalf.

## II. ANALYSIS

### A. *Competency Issues*

#### 1. *Factual background*

At several points after defendant was charged in this case and before his trial began, concerns arose over his competency to stand trial. We outline the relevant events.

On May 27, 1987, one month after the information was filed, defendant was admitted to the psychiatric inpatient facility at Harold D. Chope Community Hospital (Chope Hospital) as gravely disabled under Welfare and Institutions Code section 5150 because he appeared to be experiencing delusions and hallucinations and wanted to kill himself. His diagnosis on admission was atypical psychosis. On June 2, 1987, he was discharged back to the San Mateo County Jail with a diagnosis of acute paranoid disorder.

A little more than five months later, on November 3, 1987, the trial court suspended criminal proceedings and appointed two psychiatrists, Dr. Charles Casella and Dr. George Wilkinson, to examine defendant to determine his competence to stand trial. (§§ 1367, 1368.) The court also appointed a psychologist, Dr. Alfred Fricke, to perform tests. All three issued reports and a competency hearing was set. Shortly before the hearing, on May 6, 1988, defendant was again admitted to Chope Hospital under Welfare and Institutions Code section 5150 because his behavior was loud and bizarre, he was agitated and delusional, and he was exhibiting grandiose and paranoid ideas, looseness of associations, and disorganized thinking. His diagnosis on admission again was atypical psychosis. On May 16, 1988, he was discharged back to San Mateo County Jail with a diagnosis of chronic schizophrenia with acute exacerbation.

That same day, his first competency hearing began, a jury having been waived. On May 19, 1988, the trial court found defendant competent to stand trial.

On June 17, 1988, the trial court relieved Defense Attorneys Philip Barnett and Vincent O'Malley at defendant's request (see *People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]) and denied defendant's motion

for self-representation (see *Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562, 95 S.Ct. 2525]). A week later, Trial Counsel Douglas Gray appeared on behalf of defendant.

Eight months later, on February 16, 1989, defendant was again admitted to Chope Hospital under Welfare and Institutions Code section 5150 because he was exhibiting increasingly bizarre behavior, was delusional with loose associations and disorganized thinking, and was eating little and not showering. On admission, he was diagnosed with chronic paranoid schizophrenia, with acute exacerbation. That same day, counsel declared a doubt as to defendant's competency, which the trial court treated as a motion under Penal Code section 1367 and denied. At the prosecution's suggestion, the court appointed Dr. Wilkinson under Evidence Code section 730 to determine whether there had been any change in defendant's condition since the May 1988 competency finding.

On March 8, 1989, at the request of the prosecution and the defense, the court again suspended criminal proceedings under section 1367 and appointed a second psychiatrist, Dr. Roland Levy. Dr. Wilkinson's and Dr. Levy's reports were received on March 29, 1989.

The prosecution requested a jury trial on the question of defendant's competence. In light of Defense Counsel Gray's status as a witness, Gordon Rockhill was associated as counsel for the second competency hearing, which began on July 24, 1989. On August 3, 1989, the jury returned a finding of competency. Some two and a half months later, on October 16, 1989, jury selection began in defendant's criminal trial.

### 2. *Claims pertaining to 1989 competency trial*

#### a. *Assertedly erroneous admission of evidence*

Defendant contends the trial court erred in allowing, over defense objections at various points in the competency trial, irrelevant discussion and evidence of the factual details of the charged offenses. (Evid. Code, § 350.) Defendant further argues that any relevancy of these details was substantially outweighed by the prejudice they caused him before the competency jury, in violation of Evidence Code section 352 and his right to due process of law under the state and federal Constitutions.

Defendant complains that, during voir dire, the prosecutor asked prospective jurors, "[I]f it were to come out during the testimony of the psychiatrists that because there are multiple murder charges against Jon Dunkle, some other judge and some other jury down the road—not you, nothing for you to

consider . . . may have to consider the death penalty, do you have such strong feelings, one way or the other," that it would affect them in the competency trial. The prosecutor later asked similar questions of other prospective jurors. Defense counsel objected that the penalty in the criminal trial was irrelevant to and remote from the issues in the competency proceeding, and that competency jurors should not be considering the issue of possible penalties. The trial court allowed the prosecutor to inquire.

■ There was no error. A trial court enjoys wide latitude in determining what questions may be asked on voir dire, and its exercise of discretion in this respect forms grounds for reversal only when it renders the trial fundamentally unfair. (*People v. Cleveland* (2004) 32 Cal.4th 704, 737 [11 Cal.Rptr.3d 236, 86 P.3d 302].) Contrary to defendant's assertion, the subject of penalty was relevant to the competency trial, in that the psychiatric experts' testimony touched on defendant's understanding of the potential outcome of the criminal proceedings and his possible motivation to delay them. Defendant suffered no undue prejudice by the prosecutor's mention of the potential penalty during voir dire. (See *People v. Padilla* (1995) 11 Cal.4th 891, 925 [47 Cal.Rptr.2d 426, 906 P.2d 388] [for purposes of Evidence Code section 352, "undue" prejudice stems from evidence that " ' "tends to evoke an emotional bias against the defendant as an individual" ' " and that has a negligible bearing on the issues, "not the prejudice 'that naturally flows from relevant, highly probative evidence' "].) Defendant's due process claim lacks merit for the same reasons.

Defendant further complains of the admission of references to the uncharged killing of Sean Dannehl. First, defendant notes the prosecutor, out of the presence of the jury, stated that Dr. Missett and Dr. Wilkinson had discussed the Dannehl homicide with defendant and that he intended to bring up evidence pertaining to that offense because defendant would be "dealing with [it] during the penalty phase." Defense counsel objected on grounds of irrelevancy and undue prejudice. The trial court ruled inadmissible any mention of the Dannehl homicide unless it became clear that the probative value of such evidence outweighed its prejudicial effect. Detective Robert Bell, a homicide investigator in the Sacramento County Sheriff's Department who had worked on the Dannehl case, later testified for the prosecution without mentioning that case. Dr. Levy and Dr. Missett, in their respective testimony, referred to the existence of the Dannehl homicide, without describing any details of the offense.

The determination of the extent of a defendant's ability rationally to assist counsel in presenting a penalty defense may necessitate reference to evidence of uncharged offenses likely to be presented to the penalty phase jury. (See *People v. Turner* (2004) 34 Cal.4th 406, 427 [20 Cal.Rptr.3d 182, 99 P.3d

505]; *People v. Medina* (1990) 51 Cal.3d 870, 887–888 [274 Cal.Rptr. 849, 799 P.2d 1282]; *People v. Samuel* (1981) 29 Cal.3d 489, 494–496 [174 Cal.Rptr. 684, 629 P.2d 485].) Here, Dr. Missett testified that during the competency examination, defendant spontaneously referred to Sean Dannehl but refused to discuss the details of the offense; probing a defendant's understanding of those details, Dr. Missett noted, was relevant to the competency determination. We therefore see no error in the references to the Dannehl homicide.

Defendant additionally argues the prosecutor improperly brought the facts of the Turner and Davies homicides before the jury, causing prejudice requiring reversal of the judgment. During his opening statement to the competency jury, the prosecutor summarized the evidence of those offenses; when defense counsel objected, the prosecutor explained the evidence would show that defendant remembered what he had done in the course of the killings and related it to the evaluators. As promised, the prosecutor then presented the testimony of Belmont Police Officer Joseph Farmer, who related the substance of defendant's 1986 confessions to the Davies and Turner homicides and the Murphy attempted murder. Specifically, Farmer testified defendant said that in 1984 he approached Lance Turner on a trail, stabbed him with a knife in the throat, stomach and chest, and dragged the body off the trail into the bushes; in November 1981 he invited John Davies to have some beer and listen to his car stereo, and then at Edgewood Park took a knife from his car, walked up a hillside with John, stabbed him in the back and throat, strangled him, hit him over the head with a rock, and pushed the body 100 feet off the side of the hill; and in 1982 he deliberately ran Stephen Murphy over with his car, put him into the car, drove him to another undeveloped part of Belmont and left him there. Defendant contends these facts were irrelevant to the issues involved in the competency trial, and that he never contested (as by a claim of amnesia or organic brain damage) that he remembered his actions.

Contrary to defendant's contention, the evidence of the homicides and attempted homicide served a legitimate purpose in the competency trial: to convey to the jurors the essence of the case against which defendant would have to defend himself, in order that they could assess his understanding of the charges and ability to assist counsel in his defense. The evidence, moreover, illuminated defendant's failure to discuss the facts of the offenses with the mental health professionals appointed or retained to evaluate him, as contrasted with his earlier, more forthcoming admissions to law enforcement officers. This, in turn, tended to support the prosecution's contention that defendant could rationally assist counsel, if he so chose. In any event, a minimum of time was spent on the facts of the homicides, and the jurors were instructed not to be biased against the defendant, or swayed by sympathy, passion, prejudice, or the possible consequences of their verdict. Because the

trial court did not abuse its discretion in permitting references to the facts of the Turner and Davies homicides to come before the jury, defendant was not denied due process. (Cf. *People v. Turner, supra,* 34 Cal.4th at p. 427.)

b. *Sufficiency of evidence to support competency finding*

Defendant contends insufficient evidence supported the jury's finding of his competency, that he was in fact incompetent, and that his trial while incompetent violated state law and his federal constitutional rights of due process, to the assistance of counsel and to be present during the proceedings against him.

■ A person cannot be tried or sentenced while mentally incompetent. (§ 1367, subd. (a).) A defendant is mentally incompetent to stand trial if, as a result of mental disorder or developmental disability, he or she is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner. (*Ibid.*; see also *Dusky v. United States* (1960) 362 U.S. 402 [4 L.Ed.2d 824, 80 S.Ct. 788].) A defendant's trial while incompetent violates state law and federal due process guarantees. (*Pate v. Robinson* (1966) 383 U.S. 375, 385 [15 L.Ed.2d 815, 86 S.Ct. 836]; *People v. Pennington* (1967) 66 Cal.2d 508, 516–517 [58 Cal.Rptr. 374, 426 P.2d 942].) A defendant is presumed competent unless the contrary is proven by a preponderance of the evidence. (§ 1369, subd. (f); *People v. Medina, supra,* 51 Cal.3d at pp. 881–886; see *Medina v. California* (1992) 505 U.S. 437, 448–451 [120 L.Ed.2d 353, 112 S.Ct. 2572] [placing burden on defendant to prove incompetence does not violate due process].) ■ On appeal, the reviewing court determines whether substantial evidence, viewed in the light most favorable to the verdict, supports the finding on competency. (*People v. Marshall* (1997) 15 Cal.4th 1, 31 [61 Cal.Rptr.2d 84, 931 P.2d 262].) Evidence is substantial if it is reasonable, credible and of solid value. (*Ibid.*)

The jury heard this evidence during the 1989 competency proceedings: Court-appointed Psychiatrist Roland Levy examined defendant for 45 minutes on March 21, 1989, and concluded he was incompetent. Dr. Levy reported that defendant displayed affect inappropriate to the content of his conversation and spoke of how a computer, apparently connected to the FBI, influenced him and was responsible for the killings, but wandered off that subject and began to talk about such matters as organized crime, government control and working for secret agencies. Dr. Levy suspected defendant might be experiencing auditory hallucinations and concluded he could not distinguish his delusions from reality. Defendant's delusions had a diffuse quality, while another person with better organized paranoid schizophrenia could present a delusion in such a way as to make it almost believable. Dr. Levy

considered and rejected the possibility that defendant was faking mental illness, noting the only deception defendant seemed to be practicing was his overt denial that he was mentally ill. Dr. Levy diagnosed defendant as suffering from chronic schizophrenia with paranoid traits. He observed that defendant was reacting well to the antipsychotic medication Navane at a dosage that would cause a nonpsychotic person to feel slow and unable to think. On July 16, 1989, defendant met with Dr. Levy for 45 minutes; the next day, he refused to meet with him.

The defense then called Psychiatrist James Missett, who had examined defendant at the prosecution's request. Dr. Missett met with defendant for 45 minutes on October 7, 1986, and five hours on October 13, 1986; on July 25, 1989, he observed defendant during a 90-minute court hearing and, on another occasion, for 90 minutes in jail. Dr. Missett diagnosed defendant as having antisocial and borderline personality disorders and sexual sadism; he ruled out a diagnosis of schizophrenia, characterizing defendant's symptoms as inconsistent with a diagnosis of schizophrenia and his delusions as having a "psychosis of the day" quality. Dr. Missett believed defendant was malingering and had fooled other psychiatrists who had arrived at different diagnoses. He concluded defendant obtained gratification from "jerking people around."

The defense also called Psychiatrist George Wilkinson, whom the court had appointed to examine defendant in connection with the competency proceedings. Dr. Wilkinson examined defendant on several occasions, the first of them on May 27, 1987, when he committed involuntarily defendant, who was acutely psychotic, to Chope Hospital after an emergency referral by jail staff. His next examination of defendant, lasting more than 90 minutes, occurred on January 5, 1988, when defendant reported experiencing hallucinations. Dr. Wilkinson felt that defendant, who admitted the truth of his confessions but refused to discuss the facts of his case, was manipulating him. On January 26, 1988, Dr. Wilkinson again examined defendant, finding him competent but recommending an evaluation at Atascadero State Hospital to settle the question of whether he was malingering. (The recommended evaluation did not occur.) After defendant was again committed to Chope Hospital in May 1988, Dr. Wilkinson examined defendant and concluded that, although he had experienced psychotic episodes, he could still cooperate with counsel and was competent to stand trial. On March 1, 1989, after trial counsel reported deterioration in his relationship with defendant, Dr. Wilkinson attempted to interview defendant, who refused for delusional reasons to come out of his jail cell. Then, after a court appearance on July 7, 1989, Dr. Wilkinson saw defendant for some 45 minutes and found him to be psychotic, with disorganized thinking, loose associations, auditory hallucina-

tions and inappropriate affect. Dr. Wilkinson's two later attempts to see defendant failed when defendant stood in his urinal and refused to come out of his cell.

Dr. Wilkinson diagnosed defendant as suffering from paranoid schizophrenia, although his symptoms did not fit all the criteria for that illness. He viewed defendant's manipulation of psychiatrists as a self-protective mechanism to compensate for feelings of humiliation and low self-esteem. At times, however, defendant would get his attempts to manipulate mixed up with his illness. Dr. Wilkinson noted defendant's condition had improved when he was taking Navane, consistent with someone who has had a genuine psychotic episode. Dr. Wilkinson agreed with Dr. Levy that defendant lacked the skills to fake a major mental illness completely. He disagreed with Dr. Missett that variability in reported delusions meant the patient was faking; indeed, a lack of variation in such delusions would be more consistent with total faking.

Trial Counsel Douglas Gray testified that defendant initially expressed hostility toward him and disclosed such delusional beliefs as that his former attorney had killed a California Highway Patrol officer and received hundreds of thousands of dollars in bribes, from either organized crime or the government, to stop defendant from pleading guilty. At first defendant only wanted to plead guilty, but later he developed a working relationship with Gray. That relationship faltered as defendant's mental condition deteriorated in the fall of 1988. Defendant appeared almost emaciated and had not bathed for some time, and by January 1989 his statements were incomprehensible and disconnected and he began to refuse to see Gray. When Gray initiated competency proceedings, defendant reacted negatively, said he would not take psychotropic medication and did not want to go to Atascadero State Hospital, and declared he was not and had never been mentally ill. On the first day of competency proceedings, defendant wore his jail clothes in compliance with counsel's tactical decision. On the second day, defendant angrily said he did not want to wear jail clothes but wanted instead to wear street clothes in order to get a fair trial. Even after being removed to a holding cell, he screamed at his attorneys. Finally defendant agreed to behave in court in exchange for the attorneys' agreement to permit him to wear street clothes in court. Defendant told Gray he did not want to testify in the competency proceedings because he was embarrassed and shy about answering questions about the psychiatrists, who, he maintained, had lied. He indicated that if he could confine his testimony to the homicides there would be no problem. The attorneys would not guarantee that, so he did not testify.

Attorney Thomas Nolan testified as an expert in what is needed for a client to assist rationally in a capital case. Nolan testified that if a person is uncommunicative due to mental illness, or wants to plead guilty because a

computer was responsible for the crime and refuses to consider an insanity defense, or prefers communicating with the district attorney over his own counsel, or sends letters to sheriff's deputies without telling his counsel, he is not rationally assisting counsel and is preventing counsel from fulfilling his or her role.

The prosecution presented the testimony of several deputy sheriffs, who described their interactions with defendant at court and in jail.

On May 6, 1988, Deputy Sheriff Debra Rosengart was assigned to transport defendant to Chope Hospital. From an area where she could not be seen, Rosengart observed defendant stop talking to himself when she left his sight; when Rosengart reappeared to defendant, she saw him resume talking to himself, only to stop when she told him to do so. While transporting defendant in a van, Rosengart turned on the radio to drown out his ramblings; he stopped talking and began to sing along. While walking into the hospital, defendant was silent; after Rosengart told him to go along to his evaluation, he resumed talking to himself.

Sheriff's Sergeant Robert Prevot was assigned to the jail in 1987 and 1988 and there had contact with defendant, who was generally very quiet and read and slept a lot.

On February 16, 1989, Deputy Sheriff Martin Douglas transported defendant to court. Defendant was quiet until he was called into court, when he started babbling. As soon as defendant left court after his appearance, Douglas noticed he stopped babbling.

Deputy Sheriff William Southward, who sometimes worked in the jail, testified he never saw unusual conduct by defendant. Once Dr. Levy came to visit defendant at his cell; when defendant asserted he did not know the doctor and Southward described him, defendant refused to meet with him.

Deputy Sheriff John Quinlan testified that while he was assigned to work in the jail, he never heard defendant make unusual statements. On three to five occasions Quinlan saw defendant engage in "bizarre" behavior, including refusing to see family members, refusing to come out for recreation, and smearing a substance onto his cell window.

Deputy Sheriff David Barrett testified he had known defendant for two years as a result of his jail assignment and had a great deal of contact with him over eight to 12 months. Barrett and defendant conversed about bicycling, movies and television. When the conversation touched on his crimes, defendant spoke about computers. Defendant told Barrett he had smeared

shampoo onto his cell window in order to scare away predatory inmates by making them think he was crazy.

Joan Davies was trained to work with persons with dyslexia and spent hundreds of hours, over a four-year period, helping defendant with his reading skills before her son John disappeared. Mrs. Davies attended the trial. She testified that when the prosecutor, during his opening statement, incorrectly asserted that defendant had lived with the Davies family, defendant turned in his seat, made eye contact with Davies and her husband, and shook his head "no."

Sacramento County Sheriff's Department Investigator Robert Bell first made contact with defendant in 1984, during the murder investigations; after defendant was arrested, he occasionally contacted Bell. In February 1988, defendant complained to Bell that his attorneys were trying to present a "sham" psychiatric defense in which defendant did not want to participate. Defendant told Bell he committed the murders because he had received radar transmissions from a large antenna in Russia instructing him to kill. Bell told defendant he was disappointed because defendant had earlier confessed and now seemed to be shirking responsibility. Defendant became quiet and eventually said he wanted to talk about something else.

Belmont Police Officer Joseph Farmer testified to the contents of defendant's 1986 confessions, including the details of the Davies and Turner homicides and the assault on Steve Murphy.

Defendant contends this evidence was insufficient to support the jury's competency finding. In particular, he urges that Dr. Missett's opinion—that he was competent and malingering—was contrary to facts of record and to uncontested medical and scientific facts. Here, defendant asserts, the only substantial evidence was that he was psychotic, no evidence to the contrary was presented, and no evidence showed that even if he was psychotic he nevertheless was competent to stand trial.

■ We disagree. The opinions of the various experts stood in conflict, and in assessing their testimony the jury was entitled to consider that Dr. Missett had more than five hours of contact with defendant in 1986 against which to evaluate his behavior during the 1989 competency proceedings. The jury also heard that Dr. Wilkinson, in two 1988 reports, had found defendant competent and changed his mind after a March 1, 1989, contact that lasted only 15 minutes. Although Dr. Wilkinson saw defendant again on July 7, 1989, for 45 minutes and found him to be psychotic, he felt less than total (i.e., only 75 to 80 percent) certainty that defendant was incompetent. Dr. Levy had briefer contact with defendant than had Dr. Missett (two

45-minute evaluations), from which the jury could infer that Dr. Missett's opinion was entitled to greater weight. Although defendant argues his behavior fit the classic model of incompetency in that—like truly psychotic people—he sometimes insisted he was not mentally ill and refused to see the psychiatrists who were in a position to assist him in avoiding his criminal trial through a finding of incompetency, the jury was entitled to consider that, during his first competency trial the year before, defendant had heard expert witnesses describe the behavior of genuinely psychotic persons and the ways malingerers go wrong in feigning mental illness. The jury, moreover, was aware that defendant had the opportunity to observe the behavior of psychotic persons while in the locked psychiatric ward at Chope Hospital, and heard Dr. Wilkinson testify that defendant was cunning and manipulative, and derived gratification from frustrating psychiatrists.

Defendant cites evidence that he responded favorably to antipsychotic medications, which only a psychotic person can tolerate without becoming sleepy and clouded in thinking; on Navane, defendant related better to people, was less hostile, had less trouble controlling his impulses, and apparently experienced none of the sedation that would be expected in a nonpsychotic person taking the drug.[2] Defendant also criticizes as scientifically invalid Dr. Missett's reliance on a definition of schizophrenia as involving fixed, firm delusions (and his resulting opinion that because the reported details of defendant's delusional material varied from time to time, he must be making up the material as he went and therefore was malingering), noting that other experts acknowledged the existence of types of schizophrenia involving fluctuating or variable delusions. But whether defendant was in fact mentally ill and, if so, his precise diagnosis was not determinative of his competency. Dr. Wilkinson testified one can be both paranoid schizophrenic and competent to stand trial. The testimony of Dr. Missett and the lay witnesses describing defendant's behavior, taken together (see *People v. Marshall, supra,* 15 Cal.4th at pp. 31–32), provides substantial evidence to support the jury's finding that defendant understood the nature of the criminal proceedings and had the ability to assist his counsel in a rational manner (§ 1367, subd. (a)).

---

[2] In contesting the sufficiency of the evidence to support the 1989 competency finding, defendant cites extensively from the record of his earlier 1988 competency hearing, Dr. Missett's testimony in the penalty phase of the criminal trial, and the record of an evidentiary hearing held in 1999 to determine defendant's competency with respect to postconviction habeas corpus proceedings. While the record of the penalty phase might shed light on whether defendant was actually competent to stand trial, neither it nor the 1988 competency proceeding is directly relevant to the question whether substantial evidence supported the 1989 competency verdict. The 1999 hearing is not a part of the record on appeal, and any claims arising from it must be raised by petition for writ of habeas corpus.

c. *Asserted flaws in CALJIC No. 4.10 and reliability of competency verdict*

As requested by the parties, the trial court instructed the competency phase jury with CALJIC No. 4.10 as follows: "In this proceeding you must decide whether the defendant is mentally competent to be tried for a criminal offense. [¶] This is not a criminal proceeding and the innocence or guilt of the defendant of the criminal charge against him is not involved nor is the question of his legal insanity at the time of the commission of the offense involved. [¶] Although on some subjects his mind may be deranged or unsound, a person charged with a criminal offense is deemed mentally competent to be tried for the crime charged against him, if: [¶] One, he is capable of understanding the nature and purpose of the proceedings against him; two, he comprehends his own status and condition in reference to such proceedings; and three, he is able to assist his attorney in conducting his own defense in a rational manner. [¶] The defendant is presumed to be mentally competent. The effect of this presumption is to place upon the defendant the burden of proving by a preponderance of the evidence that he is mentally incompetent as a result of a mental disorder."

Defendant contends this instruction was flawed in several respects. The Attorney General urges that trial counsel, by joining in the prosecutor's request for the instruction, invited any error and that defendant therefore is barred from raising these contentions on appeal. On the record before us, we cannot say that trial counsel both " 'intentionally caused the trial court to err' " and did so for " 'tactical reasons.' " (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 49 [17 Cal.Rptr.3d 710, 96 P.3d 30].) Reviewing the merits of defendant's argument, we find no error.

First, defendant argues the instruction improperly permitted the jury to find him competent if it believed he had a mental disorder but could be made able to assist his counsel in a rational manner if he were administered antipsychotic medications. Defendant observes that the evidence—including his own statements and the fact that, once returned to jail after each of his involuntary commitments, he stopped taking the medication he had been compelled to take while in the hospital—indicated he would not voluntarily ingest them. Such a predicate to a competency finding, he contends, would violate both the federal Constitution and state law. He argues that because it cannot be discerned from the general verdict of competency whether the jury based its finding on permissible or impermissible considerations, the judgment cannot stand.

Defendant acknowledges that a recent decision of the United States Supreme Court permits, under certain circumstances, the involuntary administration of antipsychotic medications in order to make a criminal defendant

competent to stand trial. (*Sell v. United States* (2003) 539 U.S. 166 [156 L.Ed.2d 197, 123 S.Ct. 2174] (*Sell*).) To be consistent with the federal Constitution's protection of a defendant's liberty interest, *Sell* holds such medication must be medically appropriate, substantially unlikely to have side effects that may undermine the fairness of the trial, and, taking account of less intrusive alternatives, necessary to significantly further important governmental trial-related interests, and the trial court must so find. (*Sell, supra*, 539 U.S. at pp. 180–181, 186; *Riggins v. Nevada* (1992) 504 U.S. 127, 135–136 [118 L.Ed.2d 479, 112 S.Ct. 1810] [the Sixth and Fourteenth Amendment rights of a fair trial and due process demand that, when a criminal defendant files a motion to terminate the administration of antipsychotic medication during trial, the state must establish the need for, and medical appropriateness of, the medication]; *Washington v. Harper* (1990) 494 U.S. 210, 222–227 [108 L.Ed.2d 178, 110 S.Ct. 1028] [state law that provided convicted prisoners with administrative rather than judicial review of involuntary medication orders adequately protected constitutional liberty interests].) Defendant contends that, because the jury might have believed he would be competent only if medicated, because the trial court here did not make the findings required by *Sell*, and because the record indicates he was not voluntarily taking medication at the time of the 1989 competency trial, and indeed shows that he refused to take prescribed psychotropic medication after his release from each of his several involuntary commitments to Chope Hospital, the jury's finding of competency is invalid.

As the Attorney General observes, because this case does not involve an effort to forcibly medicate defendant, the *Sell* findings were not required. For the same reason, the jury's finding of competency here is not invalidated by decisions such as *Thor v. Superior Court* (1993) 5 Cal.4th 725, 732 [21 Cal.Rptr.2d 357, 855 P.2d 375], recognizing the right of convicted prisoners to refuse medical treatment, *Keyhea v. Rushen* (1986) 178 Cal.App.3d 526, 530, 542 [223 Cal.Rptr. 746], recognizing the right of prisoners to refuse psychotropic medication absent a judicial finding of grave disability, and *Riese v. St. Mary's Hospital & Medical Center* (1987) 209 Cal.App.3d 1303, 1308 [271 Cal.Rptr. 199], recognizing the right of psychiatric patients involuntarily committed to mental health facilities under Welfare and Institutions Code sections 5150 and 5250 to refuse antipsychotic medications absent a judicial determination of their incapacity to make treatment decisions. (See also *In re Qawi* (2004) 32 Cal.4th 1, 10 [7 Cal.Rptr.3d 780, 81 P.3d 224] [in nonemergency situations, a competent mentally disordered offender cannot be forced to take antipsychotic medications absent a judicial finding of dangerousness].)

The evidence tending to show that defendant was competent to stand trial was not predicated on his being administered antipsychotic medications. As noted, Dr. Missett testified defendant was malingering and not psychotic, and

diagnosed defendant instead with antisocial personality disorder and sexual sadism. Jail personnel testified defendant generally behaved normally in custody, supporting an inference that he was not psychotic. Nor did the evidence tending to show that defendant was incompetent directly posit that medication was necessary to make him competent: Dr. Wilkinson merely acknowledged that defendant might regain his competency and previously had benefited from taking antipsychotic medication. Neither the prosecutor nor defendant's counsel, in their closing arguments, touched on the subject of defendant's taking medication during trial or being made competent as a result of medication. Thus, given the state of the evidence and argument, there was no foundation for a jury finding that defendant was competent based on an assumption that he would be administered antipsychotic medication, voluntarily or otherwise. The trial court therefore had no obligation to instruct the jury as defendant now argues, i.e., that to return a verdict of competency on a theory that defendant was competent only if administered antipsychotic medication, it must find either that he would voluntarily take his medications or that the *Sell* factors were present. For the same reason, contrary to defendant's argument the competency verdict is not inherently vague or ambiguous.

▮ Defendant next contends that the definition of competency in CALJIC No. 4.10 is inconsistent with that mandated in *Dusky v. United States, supra,* 362 U.S. 402, and thus fails to satisfy the requirements of due process. Specifically, he argues that a person who "is able to assist an attorney in conducting his own defense in a rational manner" (CALJIC No. 4.10) does not necessarily have " 'sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding' " as *Dusky* requires. (*Dusky v. United States, supra,* 362 U.S. at p. 402.) Defendant asserts that "consult," properly understood, means actively to "deliberate together" with counsel, or in other words to "think about or discuss issues and decisions carefully," concepts assertedly missing from CALJIC No. 4.10. We previously have observed that the language of section 1367, from which CALJIC No. 4.10 is drawn, "does not match, word for word, that of *Dusky*. But as the Court of Appeal noted in *James H. v. Superior Court* (1978) 77 Cal.App.3d 169, 177 [143 Cal.Rptr. 398], 'To anyone but a hairsplitting semanticist, the two tests are identical.' " (*People v. Stanley* (1995) 10 Cal.4th 764, 816 [42 Cal.Rptr.2d 543, 897 P.2d 481].) Contrary to defendant's suggestion, CALJIC No. 4.10 requires more for a competency finding than evidence that a defendant is oriented to time and place, has a factual understanding of his circumstances, and recalls the events in question. Defendant's point therefore lacks merit.

Defendant observes that *Medina v. California, supra,* 505 U.S. at pages 450–451, held it consistent with due process to place the burden of proof of incompetency on the defendant, in part because defense counsel often has the

best informed view concerning a defendant's inability to assist in his own defense. Defendant suggests that CALJIC No. 4.10 vitiates the predicate of *Medina*, and thereby rendered it unconstitutional to impose on him the burden of proof of incompetency, by failing to tell the jury, which might otherwise perceive Gray as a partisan advocate, not to discount his testimony merely because of his status as defendant's attorney, or otherwise to convey that an attorney is an officer of the court who has special obligations to the court before which he or she appears. Defendant contends the trial court exacerbated this problem by instructing the jury, using CALJIC Nos. 2.20 and 1.02, to consider possible bias and motive in determining a witness's credibility and that statements by attorneys are not evidence. If defendant believed CALJIC No. 4.10 required elaboration or clarification in this regard, however, it was incumbent on him to request it. (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 122; *People v. Cox* (1991) 53 Cal.3d 618, 669 [280 Cal.Rptr. 692, 809 P.2d 351]; *People v. Reed* (1952) 38 Cal.2d 423, 430 [240 P.2d 590].) And, as discussed below (see *post,* at pp. 899–900), nothing in the instruction invited the jury to disregard Gray's testimony. The giving of the instruction did not deny defendant due process.

Defendant further contends that CALJIC No. 4.10, as given in this case, was deficient because it failed to give the jury sufficient guidance regarding the various constitutional rights implicated in a criminal trial and failed to tell the jury how much and what kind of assistance a defendant must be able to provide counsel. As the Attorney General observes, however, the terms contained in CALJIC No. 4.10, including the word "assist," are ones of ordinary usage. None have a technical meaning peculiar to the law on which the trial court was required to instruct absent a specific request. (*People v. Roberge* (2003) 29 Cal.4th 979, 988 [129 Cal.Rptr.2d 861, 62 P.3d 97].) If defendant believed the instruction required clarification or elaboration, he had the burden of requesting it. (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 122.) Defendant's contention thus lacks merit.

> d. *Failure to instruct jury it could find defendant competent only if he would satisfy criteria for competency throughout capital trial*

Defendant contends that CALJIC No. 4.10, as given, was defective in that it failed to convey to the jury that a defendant must meet the criteria for competency for the duration of the capital proceedings. He argues the instruction permitted the jury to find him competent even if it believed he suffered from schizophrenia and might not have been able to maintain his competency throughout the entire trial. The asserted error was prejudicial, he maintains, because the record shows his condition waxed and waned, so that he was sometimes lucid but at other times psychotic.

■ As the Attorney General points out, defendant asked the trial court to instruct the jury with CALJIC No. 4.10 and never requested a modification or clarification along these lines. The contention, therefore, is forfeited for appellate purposes. (*People v. Coffman and Marlow, supra,* 34 Cal.4th at p. 122.) In any event, the point lacks merit. To demand that the jury predict the course of defendant's competency throughout a capital trial of indeterminate length would be to insist on speculation. More important, as the Attorney General reasons, section 1368 provides for the institution of additional competency proceedings should a substantial change of circumstances or the emergence of new evidence cast doubt on the earlier finding of competency. Due process requires no more.

> e. *Trial court's response to jury request for "legal definition" of "rational manner"*

During deliberations, the jury sent the court a note asking for a "legal definition" of the term "rational manner," as used in CALJIC No. 4.10. Out of the jury's presence, the court discussed the request with counsel. After conducting research, the court and counsel could find neither a judicial decision defining the term nor a dictionary definition to which all parties would agree. Accordingly, the court instructed jurors "to rely upon the common understanding of the meaning of the word," and reread to them the first paragraph of CALJIC No. 1.01, which directed them not to single out any particular sentence, point or instruction, but to consider the instructions as a whole. Defendant contends that by referring the jury to the common understanding of the term, the court failed in its duty to assist the jury to understand the issue before it, depriving him of a reliable competency verdict under the Sixth, Eighth and Fourteenth Amendments to the federal Constitution.

The Attorney General asserts that defendant forfeited the issue for appellate purposes by approving the trial court's response, but the record reflects that his trial counsel objected to the court's proposed response and suggested a different one of his own devising, which the court declined to give. Counsel was not required to continue to argue the point in order to preserve it for appeal.

On the merits, however, we see no reasonable likelihood (*People v. Barnett* (1998) 17 Cal.4th 1044, 1161 [74 Cal.Rptr.2d 121, 954 P.2d 384]) that the trial court's response could have led the jury to misunderstand the nature of its task. That the jury expressed some uncertainty over the "legal definition" of the term "rational manner," and the parties could not agree on a definition, does not mean that the term has a technical meaning, peculiar to the law, on which the court had an obligation to instruct the jury. (See *People v. Howard*

(1988) 44 Cal.3d 375, 408 [243 Cal.Rptr. 842, 749 P.2d 279].) Thus, the trial court was not remiss in failing to instruct in the manner that defendant now argues.

Our conclusion is unaffected by the circumstance that the court followed this advice with a rereading of CALJIC No. 1.01. Nothing in the instruction would have caused the jury to minimize the importance of the competency instructions.

### f. *Refusal to permit evidence, and failure to instruct, that defendant would still be subject to criminal prosecution if found incompetent*

Counsel sought to inform the jury, through the testimony of defense experts, what would happen if defendant were found incompetent to stand trial. When counsel asked Dr. Levy whether there was "a way to get Mr. Dunkle competent," the trial court sustained the prosecutor's objection on grounds of relevancy. When counsel examined Dr. Wilkinson about his February 1988 recommendation that defendant be sent to Atascadero State Hospital for further evaluation, asking what "Atascadero" was, the trial court again sustained the prosecutor's objection on relevancy grounds. During the examination of Trial Counsel Douglas Gray, counsel asked what Gray had told defendant about the procedures occurring after the competency trial. When the prosecutor objected on grounds of relevancy, counsel explained that the information was relevant to defendant's motivations. The trial court permitted the testimony, instructing the jury that Gray's response was admitted only on the question of how much defendant understood of what he was told. Gray then answered: "I told him if he were found incompetent in these proceedings that the criminal proceedings would remain suspended, [essentially] on hold, and he would be sent to a state hospital, most likely Atascadero State Hospital here in California where he would be treated for his mental condition. [¶] I told him that he would be required to take medication, that he would not have a choice as to whether or not to take it, and that efforts would be made to restore him to competency through treatment and medication, and that there would be further proceedings to either evaluate whether or not he had been restored to competency or to simply check and see if he had been. [¶] I told him that if he were found to be competent then we would resume the normal criminal proceedings." The court instructed jurors that "the possible or potential outcome of your verdict . . . is something that is not to concern you . . . normally a jury is not told what the outcome of their verdict may be, what will happen one way or the other."

Defendant now contends the trial court erred in sustaining the prosecutor's objections to the questions quoted above and in failing to instruct on the legal consequences of a verdict of incompetency.

We see no abuse of discretion in the trial court's evidentiary rulings. As the trial court noted, the nature and functions of Atascadero State Hospital were not in issue in this case, and permitting testimony about whether or how defendant could "get competent" would have invited the jury to consider matters outside its function of determining defendant's competency.

We further conclude that defendant forfeited his claim of instructional error by failing to request the instruction he now contends the trial court should have given, and that, in any event, the trial court did not err in failing to give the instruction on its own motion.

Defendant analogizes this case to *People v. Moore* (1985) 166 Cal.App.3d 540 [211 Cal.Rptr. 856] (*Moore*). There, the Court of Appeal held a defendant was entitled to an instruction on the consequences of a verdict of not guilty by reason of insanity, a subject now covered in CALJIC No. 4.01. (166 Cal.App.3d at p. 549.) Acknowledging that a jury should not consider the subject of penalty or punishment in arriving at its decision on a criminal defendant's guilt or innocence, the *Moore* court noted that, unlike the significance of either of those verdicts, the consequence of a verdict of insanity is not commonly known to jurors. (*Id.* at pp. 552–554.) Without an appropriate instruction, the *Moore* court reasoned, the jury likely would speculate on what might happen to a defendant found not guilty by reason of insanity, and might wrongly assume he or she would walk free, like a defendant found not guilty for other reasons. (*Id.* at p. 554.) The *Moore* court concluded "the danger of an erroneous assumption during jury deliberations overshadows any possible invitation to speculate on matters likely to be discussed anyway." (*Ibid.*)

We have declined to apply *Moore* outside its original context (*People v. Marks* (2003) 31 Cal.4th 197, 222 [2 Cal.Rptr.3d 252, 72 P.3d 1222] [finding no error in the trial court's refusal of a flawed instruction, requested by the defense, regarding the consequences of a verdict of incompetency]), and do so again here. Because the outcome of any future efforts at restoring a defendant to competency is uncertain at the time when the jury must make its decision on competency, an instruction patterned after *Moore* and CALJIC No. 4.01 is necessarily speculative. Thus, even had defendant preserved his claim of error in failing to give such an instruction, it would fail.

### g. *Failure to instruct jury regarding defendant's admissions*

Defendant contends the trial court erred prejudicially under state law and violated federal due process principles in failing to instruct the competency phase jury, on its own motion, with CALJIC No. 2.71, to view his admissions with caution.[3] Acknowledging we have held that trial courts are not required to give this instruction without a request in the penalty phase of trial (*People v. Livaditis* (1992) 2 Cal.4th 759, 782–784 [9 Cal.Rptr.2d 72, 831 P.2d 297]), he observes we have recently reiterated the rule requiring such an instruction, even absent a request, in the guilt phase (*People v. Slaughter* (2002) 27 Cal.4th 1187, 1200–1201 [120 Cal.Rptr.2d 477, 47 P.3d 262]). Defendant argues that a competency trial more resembles a guilt trial than it does a penalty trial, in that—unlike a normative sentencing decision—it results in a "binary yes/no" determination, in which an affirmative determination of competency is "always unfavorable" to a defendant. We disagree. "Defendant's contrary argument is premised on the false belief a defendant in a competency proceeding has only one interest—to be found incompetent. However, unlike a criminal defendant, whose legal interest lies in being found not guilty whether he is guilty or not, the defendant in a competency proceeding has not only the right not to be tried for a criminal offense when he is incompetent; he has an equally important interest in not being sent to a mental institution with his criminal case unresolved, if he is competent." (*People v. Stanley, supra,* 10 Cal.4th at pp. 805–806.)

■ Our holding in *People v. Livaditis, supra,* 2 Cal.4th at pages 782–784, recognized that a defendant's statement, admitted during a penalty trial, may be subject to varying interpretations and thus may tend either to mitigate or to aggravate; thus, we concluded, at this phase of trial an obligation to instruct, absent a request, is inappropriate. The same reasoning applies here with equal force. Because juries—and witnesses—may disagree over whether a particular communicative act or statement by a defendant reflects competency or its opposite, an instruction cautioning a jury to view a defendant's admissions, whether direct or adoptive, with caution should be given only on request. Defendant's contention, consequently, lacks merit.

---

[3] In his opening brief, defendant contended the trial court also should have instructed, on its own motion, with CALJIC No. 2.71.5, but in his supplemental briefing he acknowledges that in *People v. Carter* (2003) 30 Cal.4th 1166 [135 Cal.Rptr.2d 553, 70 P.3d 981], we held that instruction generally need not be given absent a request. (*Id.* at pp. 1197–1198.) Defendant nevertheless contends the trial court in this case should have instructed the jury with CALJIC No. 2.71 "as to *all* evidence of purported admissions by [defendant], whether direct or adoptive in nature."

#### h. *Assertedly misleading instruction on expert testimony*

The trial court instructed the jury in accordance with CALJIC No. 2.80 as follows: "A duly qualified expert may give an opinion on questions in controversy at a trial. To assist you in deciding such questions, you may consider the opinion with the reasons given for it, if any, by the expert who gives the opinion. [¶] You may also consider the qualifications and the credibility of the expert. You are not bound to accept an expert opinion as conclusive but should give it the weight to which you find it to be entitled." (See § 1127b [requiring the trial court, when the opinion of any expert is received in evidence, to instruct in substantially the above terms, and stating no further instruction on the subject of opinion evidence need be given].)

Defendant contends this instruction was deficient because it merely permitted, but did not require, the jury to consider the factual premises underlying the expert's opinion. This omission, he urges, misled the jury to believe that, to be given weight, an expert's opinion need not be founded on any reasons. Thus, defendant argues, the instruction as given caused the jury to accept uncritically Dr. Missett's opinion that defendant was malingering rather than incompetent. He observes that CALJIC No. 2.80 was revised, after his trial, to provide that the jury should consider, in addition to the witness's qualifications and believability, "the facts or materials upon which each opinion is based, and the reasons for each opinion." (CALJIC No. 2.80 (6th ed. 1996).) Because the asserted error affected the reliability of the jury's verdict, he contends, it denied him due process of law under the Fourteenth Amendment to the federal Constitution.

As the Attorney General points out, defendant requested this instruction, without requesting it be modified along the lines he now asserts was necessary. If defendant believed the instruction was incomplete, it was incumbent on him to ask the trial court to clarify or supplement it. (*People v. Cole* (2004) 33 Cal.4th 1158, 1211 [17 Cal.Rptr.3d 532, 95 P.3d 811].) In any event, we see no reasonable likelihood the jury would have understood the instruction in the manner defendant contends. (*Estelle v. McGuire* (1991) 502 U.S. 62, 72 [116 L.Ed.2d 385, 112 S.Ct. 475]; *People v. Clair* (1992) 2 Cal.4th 629, 663 [7 Cal.Rptr.2d 564, 828 P.2d 705].) The instruction told the jury it should consider the "reasons" supporting the expert's opinion; that the jury would not have understood this term to encompass the factual assumptions underlying the opinion is implausible.

#### i. *Asserted error in instructing jury with CALJIC Nos. 1.00, 1.02 and 1.03*

Defendant contends the trial court erred in giving the jury the standard instructions that statements made by the attorneys during the trial are not

evidence (CALJIC No. 1.02), that jurors must determine the facts from the evidence and no other source (CALJIC No. 1.00), and that they must not independently investigate the facts (CALJIC No. 1.03). The problem with these instructions, defendant asserts, is that they invited the jury to disregard the testimony of Douglas Gray, defendant's counsel at the guilt and penalty phases of trial, who testified in the competency phase concerning defendant's interaction with him.

The Attorney General points out that defendant requested these instructions and argues he therefore invited any error. We agree. Although counsel did not expressly articulate a tactical purpose in requesting the instructions, that he did so in order to ensure the jury did not consider statements made by the *prosecutor* as evidence seems likely. (See *People v. Coffman and Marlow*, *supra*, 34 Cal.4th at p. 49.) We also agree with the Attorney General that defendant fails to demonstrate a reasonable likelihood that the jury misapplied the challenged instructions. (*Estelle v. McGuire, supra*, 502 U.S. at p. 72; *People v. Clair, supra*, 2 Cal.4th at p. 663.) The trial court and the parties informed the jurors, during voir dire, that they would be asked to consider the testimony of two attorney witnesses, Gray and Nolan. Neither party suggested that jurors disregard Gray's testimony because of his status as defendant's counsel in the criminal trial. Indeed, the prosecutor cited portions of Gray's testimony in his closing argument. The giving of these instructions did not constitute error.

### j. *Cumulative error*

Defendant contends that multiple instructional errors in his 1989 competency trial cumulatively resulted in prejudice and require reversal of the judgment. As we have found no instructional error, we reject this contention.

### 3. *May 1988 competency trial*

#### a. *Evidence presented*

As discussed more fully above (see *ante*, at p. 881), defendant's first competency trial commenced as his second involuntary commitment under Welfare and Institutions Code section 5150 was ending. In the May 1988 hearing, Psychologist William Horstman testified he had spent nine hours with defendant between February and May 1988; based on his observations, he concluded defendant was psychotic, grossly incompetent, and not malingering. Dr. Horstman thought defendant understood the nature of the charges, but his understanding of the proceedings was questionable. Dr. Horstman believed defendant could not cooperate in his own defense because of his delusions about his attorney and the prosecutor, but that he could be made competent with antipsychotic medication.

Dr. George Wilkinson, who had spent about three hours with defendant between December 1987 and May 1988, testified it was a close question whether defendant was competent. When Dr. Wilkinson wrote his report in February 1988, defendant was generally not psychotic and had a good understanding of his case, but in May 1987, when first admitted to Chope Hospital, he had been floridly psychotic. Dr. Wilkinson leaned toward finding defendant competent, but thought his competency might be impaired if he discontinued his medications.

Psychiatrist James Missett examined defendant in October 1986, at the prosecution's behest, to determine his state of mind at the time of the offenses, and testified about defendant's mental state at the time of that examination. Dr. Missett diagnosed defendant as having mixed personality disorder with borderline features, a history of drug abuse, sexual sadism, and sociopathy, but no psychosis. Dr. Missett believed, however, that defendant's personality disorders were not necessarily inconsistent with the psychotic features described in the 1988 Chope Hospital records.

Dr. Charles Casella examined defendant on several occasions in November 1987 and January and May 1988, and testified defendant had some understanding of the proceedings and the role of his attorneys, but also expressed some delusional thinking about his attorney. Casella concluded defendant had experienced genuine psychotic episodes and was not malingering, but was competent at the time of his May 1988 interview. In Casella's view, the primary factor determining whether defendant's psychotic symptoms would abate was medication, and whether defendant would continue to take it was difficult to predict.

The prosecution presented several nonexpert witnesses, including law enforcement and jail personnel. Their testimony supported an inference that defendant generally acted and spoke normally, and that he appeared capable of ceasing any strange behavior at will.

At the conclusion of the hearing, the court found defendant competent.

b. *Claims raised*

Defendant asserts the competency proceedings conducted in May 1988 were flawed in some of the same respects as his 1989 competency trial. Specifically, he contends that the court in the 1988 proceedings applied the wrong legal standard by finding him competent provided he were to be medicated if he ceased to be willing to cooperate with his counsel (see *ante,*

at pp. 891–893); and that the competency verdict was unreliable because it depended on the fulfillment of a condition subsequent (i.e., the administration of psychotropic drugs) (see *ante*, at p. 893). Additionally, observing the proceeding took place while defendant was completing a 14-day hold at Chope Hospital under Welfare and Institutions Code section 5250, he contends that the trial court erred in refusing to hold the hearing at a time when defendant was not receiving medication (see *ante*, at pp. 891–893).

In finding defendant competent to stand trial in May 1988, the trial court remarked: "There has been some discussion, both during the hearing and in argument, about what slice of the time we're looking at, and for the purpose of my ruling, I think I should make it clear that I am incorporating, at least to some extent, the concept of the reasonable present time, rather than some microsecond in time. I think that is actually part and parcel of the concept of being competent to stand trial. I don't think that implies that the person's competent—that competency is determined based on a person's ability to make it through the first twenty minutes of a trial. I think that standing trial implies going through a trial.

"And I do find, based on the evidence presented, that Mr. Dunkle is competent to stand trial within that definition.

"I think it's clear that he's able to both understand the nature of the proceedings and to cooperate with his counsel in a meaningful way.

"Whether or not he will cooperate with counsel is perhaps a separate question and is a question that may be difficult to answer with respect to any defendant in a criminal case, wholly without regard to any mental condition that he may have.

"I recognize that it may require continued medication for Mr. Dunkle to remain willing to cooperate with his counsel, but I—I do find by a preponderance of the evidence, certainly, that he is able to do so. And based on that ruling, I will reinstate the criminal proceedings."

Thus, the trial court's ruling was not, contrary to defendant's argument, "conditioned" on his continued ingestion of psychotropic medications or reflective of a misunderstanding of the relevant legal standard. Instead, the court essentially acknowledged the evidence showing the utility of such medications in maintaining defendant's willingness to cooperate with counsel, and the possibility that he would become unwilling to do so if he discontinued his medication. The court also was aware of testimony by Drs. Casella and Wilkinson and of a stipulation between the parties that defendant had at times refused to take his prescribed medication. Apparently,

however, this evidence, in the trial court's view, did not outweigh the evidence showing defendant was presently competent. Any attempt to predict whether defendant would continue to comply with his medication regimen necessarily would have been speculative, and would not have reached the ultimate question whether, assuming defendant ceased taking medication, his condition would deteriorate to the point that he no longer would be able to cooperate with counsel. As the trial court no doubt recognized, moreover, such a significant change in defendant's condition would warrant the institution of renewed competency proceedings, as in fact happened. Accordingly, based on the evidence before it, the trial court did not err in finding defendant competent in 1988. For the same reason, defendant's claim that the competency finding was unreliable because it depended on the fulfillment of a condition subsequent lacks merit.

We likewise reject defendant's contention that the trial court erred in refusing to hold the competency hearing at a time when defendant was not receiving psychotropic medication. As the Attorney General observes, there is limited evidence concerning how, or to what extent, defendant's recent ingestion of medication could have masked his incompetence from the experts or the court. Nor was there evidence that medication negatively affected defendant's understanding of the proceedings or his ability to cooperate with counsel. The expert witnesses were aware of defendant's hospital and jail records reflecting what he was prescribed and what he ingested, and presumably took such information into account in formulating their opinions.

Having rejected defendant's specific claims of error, we further reject his claim that the cumulative impact of those asserted errors dictates reversal.

### 4. *Failure to hold another competency trial in June 1988*

On June 17, 1988, several weeks after the trial court found defendant competent to stand trial, a different superior court judge held a hearing, outside the presence of the prosecutor, on defendant's motion for substitute counsel. (See *People v. Marsden, supra,* 2 Cal.3d 118.) In attempting to explain to the court why he wanted his attorneys, Vincent O'Malley and Philip Barnett, relieved and the district attorney appointed in their stead, defendant accused O'Malley of having killed a California Highway Patrol officer and both of taking a $275,000 bribe, from either the FBI or the Central Intelligence Agency, to get him into a mental hospital. Barnett observed that defendant appeared to believe his attorneys were operating against his interests, and invited the court to inquire into the basis of that belief. Lacing his comments with profanity and vulgar epithets, defendant complained that, among other things, counsel were failing to provide him with "proper legal

material." In response to the court's request for comment, O'Malley said: "I think [defendant's allegation] is so incoherent that I don't believe in my own mind that Mr. Dunkle is even competent to proceed with the *Marsden* motion."

After the prosecutor returned to the courtroom, Barnett declared a doubt as to defendant's competency to cooperate with counsel. The court asked Barnett, in essence, to explain how defendant's condition had changed. Barnett answered that, at the competency trial, defendant did not appear to be incoherent; in contrast, defendant was now "on medication, and it's my belief that his mental and emotional condition are different now than they were at the time the judge made his decision." Barnett then made an offer of proof "that a Ph.D., clinical psychologist employed by the defense, examined Mr. Dunkle on Saturday or Sunday and told me that in her opinion Mr. Dunkle was completely incompetent to proceed to trial and to cooperate with counsel." In response to the court's request for a written report, Barnett acknowledged none had been prepared. In opposition, the prosecutor asserted that, during the earlier competency proceeding, the defense had presented evidence of conduct similar to that which defendant was displaying and counsel was describing.

The court denied the request to institute competency proceedings "without prejudice to the defense presenting me with some evidence that there are some new facts in the case. And I'll accept a written report from the psychiatrist or psychologist."

Defendant contends the trial court erred in refusing to order another competency hearing. He acknowledges that, given the May 1988 finding that defendant was competent, a new competency hearing was required only upon a substantial change in circumstances, or new evidence that cast serious doubt on the earlier finding. (*People v. Frye* (1998) 18 Cal.4th 894, 1005 [77 Cal.Rptr.2d 25, 959 P.2d 183].) He nevertheless argues that the new evidence of incompetency deprived the judge of the discretion not to order a hearing. (*People v. Pennington, supra*, 66 Cal.2d at pp. 518–519.) That is, defendant contends his attorney's assertion that his condition had deteriorated, together with the intrusion of his paranoid thinking, which he had previously expressed only outside of court, into the proceedings and the offer of proof of the unidentified psychologist's opinion that he was incompetent, compelled the suspension of criminal proceedings and the institution of another competency hearing. Defendant argues the trial court further erred in refusing to hear testimony by the psychologist.

We disagree. First, counsel's unparticularized assertion that defendant's condition had deteriorated, with no explanation of how it had done so,

essentially amounted to no more than an invocation of the legal standard for institution of renewed competency proceedings after an initial determination of competency. Second, defendant's asserted belief that O'Malley had killed a California Highway Patrol officer, and similar paranoid thinking, was, as defendant acknowledges, not a new development. Finally, even the proffered opinion of the unidentified psychologist that defendant was incompetent, without further specifics, would not necessarily compel the trial court to declare a doubt regarding competency, given that some other mental health professionals had also testified defendant was incompetent. The defense apparently never took up the court's invitation to submit a written report by the psychologist in which specific indications of a substantial change in circumstances might have been laid out. In any event, even were we to agree that the trial court erred in failing to institute competency proceedings on June 17, 1988, the question of defendant's competency was eventually relitigated the following year. Defendant thus was not forced to stand trial while a doubt existed regarding his competency.

### 5. *Failure to grant defendant immunity*

Defense counsel wished to have defendant testify during the May 1988 competency hearing, but wanted to preclude the prosecution from using any of defendant's testimony in a future trial of his guilt. Accordingly, counsel asked the court to grant defendant immunity for anything he might say on the witness stand. The trial court refused to do so. Defendant neither testified nor made a proffer of testimony. Defendant contends the ruling denied him due process of law and a reliable competency determination.

■ Although we have characterized as "doubtful" the general proposition that a trial court has the inherent authority to grant immunity to a defense witness (*People v. Lucas* (1995) 12 Cal.4th 415, 460 [48 Cal.Rptr.2d 525, 907 P.2d 373]), defendant relies on an exception first recognized in *Tarantino v. Superior Court* (1975) 48 Cal.App.3d 465, 470 [122 Cal.Rptr. 61] (*Tarantino*), and approved in *People v. Arcega* (1982) 32 Cal.3d 504, 521–523 [186 Cal.Rptr. 94, 651 P.2d 338], under which statements that a defendant makes in the course of a mental competency examination pursuant to section 1369 may not be used in a trial on the question of his guilt. The immunity created by *Tarantino*, however, is designed to obviate the compelled self-incrimination inherent in a court-ordered competency examination. (*Tarantino, supra,* 48 Cal.App.3d at p. 469 ["As to the right against self-incrimination, we find no violation in compelling a defendant to submit to examination by court-appointed psychiatrists under section 1367 et seq., at least under a judicially declared immunity reasonably to be implied from the code provisions"]; *People v. Arcega, supra,* 32 Cal.3d at p. 522 ["This rule [of immunity] is necessary to ensure that an accused is not convicted by use

of his own statements made at a court-compelled examination"].) A defendant's voluntary choice to take the stand during the competency trial falls outside the scope of the *Tarantino* immunity.

*People v. Harris* (1987) 192 Cal.App.3d 943 [237 Cal.Rptr. 747], on which defendant relies, is not inconsistent with this conclusion. That case held that if the prosecution wishes to rebut defense testimony concerning the defendant's mental capacity to commit an offense, it must conduct a psychiatric examination using psychiatrists or psychologists other than those who examined the defendant for the purposes of determining competency to stand trial. (*Id.* at p. 949.) The *Harris* court also concluded that a defendant who takes the stand to testify in his own behalf during the guilt trial does not waive the immunity conferred on his statements made to mental health professionals in the course of the competency examination. (*Ibid.*) It did not hold that a defendant is entitled to testify under a grant of judicial immunity during the competency trial. Contrary to defendant's argument, in acknowledging before the trial court that defendant's statements to mental health professionals could not be used against him in his criminal trial, the Attorney General did not become estopped to argue before this court that defendant was not entitled to judicial immunity for testimony given in the competency trial.

*People v. Weaver* (2001) 26 Cal.4th 876 [111 Cal.Rptr.2d 2, 29 P.3d 103], which defendant also cites, does not hold to the contrary. There, applying *Tarantino* and *Arcega*, we held that the testimony of two psychiatrists who examined the defendant regarding both his competency to stand trial and his sanity at the time of the charged offenses was inadmissible in the sanity phase of trial because the defendant was not permitted to invoke his constitutional privilege against self-incrimination in speaking to the doctors. (*Id.* at p. 961.) That circumstance does not exist here.

Defendant's claim of error in the trial court's refusal to grant him immunity for purposes of testimony during the May 1988 competency trial therefore must fail. And in the absence of a proffer of defendant's testimony, the record would not support a conclusion that the ruling, even if erroneous, was prejudicial.

B. *Guilt Phase Issues*

 1. *Asserted Faretta error*

Defendant contends that on June 17, 1988, a superior court judge (not the judge who presided at trial) erred in denying his motion to represent himself under *Faretta v. California, supra,* 422 U.S. 806 (*Faretta*). The Attorney General asserts that defendant's waiver of self-representation later cured any error. We agree with the Attorney General.

Analysis of this contention requires a recitation at some length of the pertinent factual background. As mentioned above (see *ante*, at pp. 903–904), on June 15, 1988, defendant moved to dismiss his attorneys, Barnett and O'Malley, and have the district attorney represent him. (See *People v. Marsden, supra*, 2 Cal.3d 118 (*Marsden*).) When told that representation by the prosecutor was impossible, defendant renewed his motion to dismiss his attorneys and asked to represent himself.

Defense counsel raised a doubt as to defendant's competency and argued that if the court did not agree that defendant was incompetent, then there was a breakdown in the attorney-client relationship. The court disagreed. O'Malley noted that defendant's *Faretta* motion remained pending, and both defense attorneys moved to withdraw as counsel, citing a deterioration in the attorney-client relationship.

The court then asked defendant a number of questions to determine whether his request for self-representation was voluntary. Defendant responded that he understood the court's admonitions, was aware of the dangers of self-representation, and knew he potentially faced the death penalty. He also expressed a desire to plead guilty, but the court said it would not allow him to do so even if he represented himself. In response to the court's inquiry about his education, defendant said he had graduated from high school and had one year of college. The court asked whether defendant had any problem understanding English; defendant answered in the negative, although he acknowledged he needed some words explained to him. The court told defendant he might not understand much of the language to be used in the trial.

The court denied the *Faretta* motion, stating: "I think the record adequately reflects the reason for the court's denial, but the court does not feel that [defendant] is competent to represent himself in this particular action based upon his education and his language." The court also stated it was granting the *Marsden* motion, apparently referring to Barnett's and O'Malley's motion to withdraw. The court ordered the transcript of the hearing sealed.

More than a year later, on July 27, 1989, the judge then presiding over defendant's competency trial ordered the transcript of the June 17, 1988, hearing unsealed at the parties' joint request. Defense Counsel Gray argued the transcript revealed error in the denial of defendant's *Faretta* motion. The prosecutor and the judge agreed. In an effort to cure the error in denying his *Faretta* motion, the judge offered to examine defendant immediately concerning his current thoughts on self-representation, and to do so again after the verdict in the competency trial. The judge explained to defendant that the transcript of the June 17, 1988, hearing revealed that incorrect "procedure"

had been followed and that the court and counsel were discussing how to remedy the problem. The judge then declared a recess to allow defendant to confer with his attorneys.

When the court reconvened, competency Trial Counsel Rockhill stated that defendant did not then wish to represent himself. At the prosecutor's request, the court examined defendant on the issue. Defendant stated that he understood what they had been discussing and that, with respect to his attorneys, "I personally don't like either one of them as far as their attitudes toward me, but I do agree with what you just said, I do not want to represent myself. I need some lawyers." During the afternoon session that day, Trial Counsel Gray moved to dismiss the case based on *Faretta* error. The court denied the motion, stating it believed any error had been cured because defendant was given and declined the opportunity to represent himself, and would be given the same opportunity after the determination of his competency.

On October 10, 1989, after the jury found defendant competent to stand trial, and before the start of voir dire in the criminal trial, the trial court again asked defendant if he wished to represent himself. Defendant answered: "I don't want to represent myself. I want the lawyer—the lawyer to take full responsibility of the case for shipping me to San Francisco for the federal jury." The court commended defendant on his decision, and defendant replied: "I don't really appreciate his work but we will see how it goes. If you are willing to take the responsibility, Mr. Gray. Mr. Dunkle cannot sign anything because it is the responsibility of the government and they are responsible for the murders for controlling Mr. Dunkle on the headwave without the permission of Jon Dunkle."

On appeal, defendant contends the trial court erred in denying his *Faretta* motion on June 17, 1988, and that later proceedings failed to remedy the error. As defendant observes, *Faretta* holds that the Sixth Amendment grants an accused personally the right to present a defense and thus to represent himself upon a timely and unequivocal request. (*People v. Marshall, supra,* 15 Cal.4th at pp. 20–21.) The right to self-representation obtains in capital cases as in other criminal cases (*People v. Clark* (1990) 50 Cal.3d 583, 617 [268 Cal.Rptr. 399, 789 P.2d 127]), and may be asserted by any defendant competent to stand trial—one's technical legal knowledge, as such, being irrelevant to the question whether he knowingly and voluntarily exercises the right (*Godinez v. Moran* (1993) 509 U.S. 389, 399–400 [125 L.Ed.2d 321, 113 S.Ct. 2680]; *People v. Joseph* (1983) 34 Cal.3d 936, 943–944 [196 Cal.Rptr. 339, 671 P.2d 843]). The right to representation by counsel persists until a defendant affirmatively waives it, and courts indulge every reasonable inference against such waiver. (*People v. Marshall, supra,* 15 Cal.4th at p. 20.) Applying these standards, we conclude defendant's

June 17, 1988, request to represent himself, made over a year before the commencement of his criminal trial, was timely, and the Attorney General does not argue it was either involuntary or other than knowing. Notably, when he made the request, defendant had just been found competent to stand trial. Thus, the superior court erred in denying the request.

Defendant acknowledges that the *Faretta* right, once asserted, may be waived or abandoned. In *McKaskle v. Wiggins* (1984) 465 U.S. 168 [79 L.Ed.2d 122, 104 S.Ct. 944], in which the trial court appointed standby counsel for a self-represented defendant, the United States Supreme Court concluded that the defendant, who had acquiesced in standby counsel's participation at various points during the trial, could not complain on appeal that he was denied his right to represent himself at those points. (*Id.* at pp. 182–183.) In *Brown v. Wainwright* (5th Cir. 1982) 665 F.2d 607, the federal court of appeals concluded that a defendant who, expressing dissatisfaction with his attorney, first asserted his right of self-representation and later made no objection when his counsel told the court that he and the defendant had resolved their difficulties and that the defendant wanted him to continue his representation, had waived his *Faretta* request. (*Id.* at p. 611; see also *People v. Rudd* (1998) 63 Cal.App.4th 620, 628–631 [73 Cal.Rptr.2d 807]; *id.* at p. 631 [a defendant who failed to object to revocation of his self-represented status for " 'serious and obstructionist misconduct' " in failing to be ready for trial on the date he had agreed could not complain on appeal]; *People v. Skaggs* (1996) 44 Cal.App.4th 1, 7–9 [51 Cal.Rptr.2d 376] [even if the defendant's equivocal comment were construed as a *Faretta* request, he abandoned it by failing to seek a definitive ruling on it]; *People v. Kenner* (1990) 223 Cal.App.3d 56, 62 [272 Cal.Rptr. 551] [a defendant may, by his or her conduct, indicate abandonment or withdrawal of a request for self-representation].)

We agree with defendant that the proceedings of July 27, 1989, although resulting in defendant's clear disclaimer of his *Faretta* rights, failed to remedy the error in the denial of his *Faretta* request because criminal proceedings were then suspended due to the pendency of the competency hearing. (See § 1368, subd. (c) ["[W]hen an order for a hearing into the present mental competence of the defendant has been issued, all proceedings in the criminal prosecution shall be suspended until the question of the present mental competence of the defendant has been determined"]; *People v. Horton* (1995) 11 Cal.4th 1068, 1108 [47 Cal.Rptr.2d 516, 906 P.2d 478]; *People v. Marks* (1988) 45 Cal.3d 1335, 1340 [248 Cal.Rptr. 874, 756 P.2d 260].) We disagree, however, with defendant's further contention that the proceedings of October 10, 1989, after the resumption of criminal proceedings, failed to correct the error because the record reflects he was talking "gibberish" and thus did not intentionally and voluntarily waive a constitutional right. Defendant does not now appear to assert he was incompetent on

that date, and any such assertion must fail. As the Attorney General notes, defendant had already had two competency hearings, most recently some two months earlier, and no substantial change of circumstances, warranting yet another competency inquiry, had occurred. (*People v. Lawley* (2002) 27 Cal.4th 102, 136 [115 Cal.Rptr.2d 614, 38 P.3d 461].) In any event, the record contains no suggestion that defendant did not understand what he was giving up in confirming that he wished to be represented by counsel, or that he might in fact have wished to represent himself notwithstanding his statements to the contrary during the October 10, 1989, proceedings as well as the earlier hearing. For this reason, too, the circumstance that the court informed defendant that the trial would start the following week, or that in 1988 it had declined to permit defendant to plead guilty, did not render his waiver of *Faretta* rights involuntary. Because the proceedings of October 10, 1989, cured the error in denying defendant his *Faretta* rights, any error in the court's denial of the defense motion for mistrial based on the *Faretta* error was nonprejudicial.

Defendant further asserts that, in any event, reversal of the judgment is required because the trial court's error in denying his *Faretta* motion resulted in his being forced to accept unwanted representation by counsel for an entire year, during which period resolution of the case was delayed, against his wish to plead guilty. But he cites no authority for the proposition that a defendant who, following an erroneous denial of his assertion of *Faretta* rights, validly waives the right to self-representation and proceeds to trial represented by counsel is entitled to relief on appeal. Indeed, such decisions as *McKaskle v. Wiggins, supra,* 465 U.S. 168, and *Brown v. Wainwright, supra,* 665 F.2d 607, are to the contrary, and we therefore reject the contention.

2. *Asserted instructional error*

a. *Failure to instruct on diminished capacity*

Defendant contends his conviction of the murder of John Davies must be reversed because the trial court failed to instruct the jury on voluntary manslaughter based on diminished capacity negating the mental state required for first or second degree murder.

At the time of the Davies murder, the defense of diminished capacity was still recognized in California, and the parties agree that, if warranted by the evidence, diminished capacity instructions should have been given in this case. (*People v. Pensinger* (1991) 52 Cal.3d 1210, 1240–1241 [278 Cal.Rptr. 640, 805 P.2d 899]; see Stats. 1981, ch. 404, §§ 2, 4, pp. 1591–1592 [amending § 22 and adding § 28]; see generally *People v. Saille* (1991) 54 Cal.3d 1103, 1111–1112 [2 Cal.Rptr.2d 364, 820 P.2d 588].) That condition is

met when the record contains substantial evidence from which a reasonable jury could conclude that a defendant's voluntary intoxication or mental defect may have prevented him from forming the mental state required for the charged offense. (*People v. Flannel* (1979) 25 Cal.3d 668, 684–685 [160 Cal.Rptr. 84, 603 P.2d 1].)

In arguing such instructions should have been given, defendant notes that he told police, in a confession that was admitted into evidence, that he was "pretty well drunk" the night he killed Davies, that he had spent time earlier that evening with other friends, drinking and "taking dope," and that when he drank beer and consumed marijuana his "body chemistry" changed, he became aggressive, and he developed "extremely assaultive behavior."

This evidence, however, "lent only minimal and insubstantial support to [defendant's] theory of diminished capacity from intoxication and therefore was not sufficient to justify the requested instruction." (*People v. Rodriguez* (1986) 42 Cal.3d 730, 762 [230 Cal.Rptr. 667, 726 P.2d 113].) That defendant was, to some degree, intoxicated on the night of the offense, and that he behaved aggressively after consuming alcohol and marijuana, did not constitute substantial evidence that he lacked the capacity to form the intent to kill or to premeditate and deliberate. To the contrary: Defendant's description of his conduct in killing Davies failed to reflect the influence of alcohol or marijuana. He admitted that after picking up Davies and driving to Edgewood Park, he took a knife from the glove compartment and "committed" himself to killing Davies. After walking with Davies a half-mile to two miles down a dirt road, defendant stabbed him in the back, sat on his chest, stabbed him in the throat, and struck him in the head with a large rock. Defendant proceeded to dispose of the body and the clothing he had been wearing. This goal-directed, purposeful behavior is incompatible with any suggestion of diminished capacity. Thus, lacking a sufficient evidentiary predicate for instructions on voluntary manslaughter on a theory of diminished capacity, the trial court did not err in failing to give them.

b. *Failure to instruct on requirement that defendant have "maturely and meaningfully reflected"*

Defendant argues we must reverse the judgment as to the Davies count because the instructions failed to include "mature and meaningful reflection" as an element of first degree murder. His contention finds its genesis in *People v. Wolff* (1964) 61 Cal.2d 795 [40 Cal.Rptr. 271, 394 P.2d 959]. In that case, we reduced from first to second degree a murder judgment entered against a defendant who, when he killed his mother, was 15 years old and a diagnosed schizophrenic, and who had unsuccessfully defended on the ground of insanity. Although we concluded the evidence sufficiently supported the jury's finding that the defendant was legally sane when he

committed the crime, we found it insufficient to establish that the murder was of the first degree: "[I]n the light of defendant's youth and undisputed mental illness, all as shown under the California M'Naughton rule on the trial of the plea of not guilty by reason of insanity . . . the true test must include consideration of the somewhat limited extent to which this defendant could *maturely and meaningfully reflect* upon the gravity of his contemplated act." (*Id.* at p. 821.) Several weeks after the Davies killing, on January 1, 1982, a statutory amendment became effective that provides that, to prove a killing was "deliberate and premeditated," it is unnecessary to prove the defendant maturely and meaningfully reflected on the gravity of his or her act. (§ 189, as amended by Stats. 1981, ch. 404, § 7, p. 1593.)

In this case, the trial court instructed the jury with CALJIC No. 8.20 that "[t]he word deliberate means formed or arrived at or determined upon as a result of careful thought and weighing of considerations for and against the proposed course of action. The word premeditated means considered before-hand." Defendant contends the instruction erroneously omitted the require-ment of "mature and meaningful reflection," and that his conviction must be reversed as a consequence.

Defendant's argument lacks merit. From the portion of the *Wolff* decision quoted above, it is clear that our recognition of the "mature and meaningful reflection" requirement depended on the circumstances of the case, in particu-lar the defendant's youth and mental illness in the context of his insanity defense. *Wolff* has never been read as mandating jury instructions on "mature and meaningful reflection" in a murder prosecution in which the evidence fails to raise an issue as to legal sanity or diminished capacity stemming from mental illness or intoxication. Indeed, in *People v. Fain* (1969) 70 Cal.2d 588 [75 Cal.Rptr. 633, 451 P.2d 65], where the defendant presented no evidence of mental illness and the trial court premised diminished capacity instructions on "the most fragmentary evidence of intoxication" (*id.* at p. 596), we rejected a claim similar to the one defendant asserts here. We observed: "Unlike the situation in *Wolff*, however, defendant did not present evidence of mental illness during the guilt phase. His defense, we repeat, was that of alibi, not diminished capacity. In this case the diminished capacity instruction given by the court [citation] fully informed the jury to the extent permitted by the evidence." (70 Cal.2d at p. 597; see also *People v. Cruz* (1980) 26 Cal.3d 233, 243 [162 Cal.Rptr. 1, 605 P.2d 830] ["The *Wolff* language has been endorsed repeatedly by this court in diminished-capacity murder cases where premeditation was an issue"].) Defendant cites no case requiring an instruc-tion on "mature and meaningful reflection" outside the context of a dimin-ished capacity defense.

Here, as noted, the record contains no evidence of diminished capacity or mental illness in connection with the Davies murder. Accordingly, defendant

was not entitled to an instruction on "mature and meaningful reflection" as an aspect of premeditation and deliberation. His derivative claims of federal constitutional violations likewise must fail.

#### c. *Asserted flaws in CALJIC No. 2.02*

At the conclusion of the guilt phase, the trial court instructed the jury with CALJIC No. 2.02, concerning the sufficiency of circumstantial evidence to prove the specific intent or mental state with which an act was done. Defendant contends the instruction undermined the accuracy of the verdicts, operated as a mandatory conclusive presumption, and misled the jury about the burden of proof on the ultimate issue of guilt or innocence, in violation of the Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. Specifically, he complains about the portion of the instruction that told the jury that if one interpretation of the evidence regarding specific intent or mental state appeared to be reasonable, and the other interpretation to be unreasonable, it must accept the reasonable interpretation and reject the unreasonable one. Although he did not object at trial to this instruction, to the extent the asserted instructional error affected his substantial rights, the claim is preserved for appellate review. (§ 1259; see *People v. Prieto* (2003) 30 Cal.4th 226, 247 [133 Cal.Rptr.2d 18, 66 P.3d 1123].)

As defendant acknowledges, we previously have rejected his interpretation of CALJIC No. 2.02 (*People v. Crew* (2003) 31 Cal.4th 822, 847 [3 Cal.Rptr.3d 733, 74 P.3d 820]; *People v. Nakahara* (2003) 30 Cal.4th 705, 713–714 [134 Cal.Rptr.2d 223, 68 P.3d 1190]; *People v. Millwee* (1998) 18 Cal.4th 96, 160 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Crittenden* (1994) 9 Cal.4th 83, 144 [36 Cal.Rptr.2d 474, 885 P.2d 887]), and we do so again here. The circumstance that the jury was also instructed with the definition of reasonable doubt and that it was required to accept and follow the court's instructions (pursuant to CALJIC Nos. 2.90 and 1.00, respectively) did not render CALJIC No. 2.02 misleading.

#### 3. *Cumulative error*

Defendant urges this court to hold the errors he asserts occurred during the guilt phase of his trial to be reversible when considered cumulatively. Apart from the *Faretta* error that we have concluded was cured, we have found no error in this phase of the trial. The contention therefore must fail.

### C. *Penalty Phase Issues*

#### 1. *Asserted conflict of interest on the part of defense counsel*

Defendant contends that his counsel labored under a conflict of interest during the penalty phase and the trial court erred in failing to conduct an

appropriate inquiry. The conflict arose, he asserts, because the penalty defense centered on defendant's current mental state, and counsel had testified during the second competency trial concerning the same subject matter. Counsel presented only one witness in the penalty phase, Psychiatrist George Wilkinson, but did not himself testify despite his personal knowledge of facts supporting the penalty defense. Moreover, counsel presented what defendant characterizes as an unfavorable stipulation, in lieu of his own testimony, as surrebuttal to the prosecution's rebuttal testimony. The trial court, having presided over the second competency trial, knew or should have known of the conflict, but improperly took no action. This inaction, defendant asserts, violated his constitutional right to representation by conflict-free counsel.

■ "The right to effective assistance of counsel, secured by the Sixth Amendment to the federal Constitution, and article I, section 15 of the California Constitution, includes the right to representation that is free from conflicts of interest." (*People v. Cox* (2003) 30 Cal.4th 916, 948 [135 Cal.Rptr.2d 272, 70 P.3d 277] (*Cox*).) " ' "Conflicts of interest may arise in various factual settings. Broadly, they 'embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person *or by his own interests.*' " ' [Citation.]" (*People v. Roldan* (2005) 35 Cal.4th 646, 673 [27 Cal.Rptr.3d 360, 110 P.3d 289].)

■ "Under the federal Constitution, when counsel suffers from an actual conflict of interest, prejudice is presumed. (*Cuyler v. Sullivan* (1980) 446 U.S. 335[, 349] [64 L.Ed.2d 333, 100 S.Ct. 1708].) This presumption arises, however, 'only if the defendant demonstrates that counsel "actively represented conflicting interests" and that "an actual conflict of interest adversely affected his lawyer's performance." ' (*Strickland v. Washington* (1984) 466 U.S. 668, 692 [80 L.Ed.2d 674, 104 S.Ct. 2052], citing *Cuyler v. Sullivan, supra,* at p. 348.) An actual conflict of interest means 'a conflict that affected counsel's performance—as opposed to a mere theoretical division of loyalties.' (*Mickens v. Taylor* (2002) 535 U.S. 162, 171 [152 L.Ed.2d 291, 122 S.Ct. 1237], italics omitted.)" (*People v. Roldan, supra,* 35 Cal.4th at p. 673.) The Sixth Amendment to the federal Constitution dictates reversal if a defendant, over a timely objection, is forced to continue with conflicted counsel. (*Holloway v. Arkansas* (1978) 435 U.S. 475, 488 [55 L.Ed.2d 426, 98 S.Ct. 1173].) "To obtain a reversal for this type of error, 'the defendant need not demonstrate specific, outcome-determinative prejudice. [Citation.] But he must show that an actual conflict of interest existed and that that conflict adversely affected counsel's performance.' (*People v. Bonin* (1989) 47 Cal.3d 808, 837–838 [254 Cal.Rptr. 298, 765 P.2d 460]; see generally *Mickens v. Taylor, supra,* 535 U.S. 162 [167–172].)" (*Roldan, supra,* at p. 674.)

 " ' "To show a violation of the corresponding right under our state Constitution, a defendant need only demonstrate a *potential* conflict, so long as the record supports an 'informed speculation' that the asserted conflict adversely affected counsel's performance. [Citations.]" (*People v. Frye* (1998) 18 Cal.4th 894, 998 [77 Cal.Rptr.2d 25, 959 P.2d 183].) "But '[p]ermissible speculation giving rise to a conflict of interest may be deemed an informed speculation . . . only when such is grounded on a factual basis that can be found in the record.' " [Citations.]'

 " 'To determine whether counsel's performance was "adversely affected," we have suggested that [*Cuyler v.*] *Sullivan*[, *supra*, 446 U.S. 335 [64 L.Ed.2d 333, 100 S.Ct. 1708]], requires an inquiry into whether counsel "pulled his punches," i.e., whether counsel failed to represent defendant as vigorously as he might have, had there been no conflict. [Citation.] In undertaking such an inquiry, we are . . . bound by the record. But where a conflict of interest causes an attorney *not* to do something, the record may not reflect such an omission. We must therefore examine the record to determine (i) whether arguments or actions omitted would likely have been made by counsel who did not have a conflict of interest, and (ii) whether there may have been a tactical reason (other than the asserted conflict of interest) that might have caused any such omission.' " (*People v. Roldan, supra,* 35 Cal.4th at p. 674, quoting *Cox, supra,* 30 Cal.4th at pp. 948–949.)

 Defendant argues that counsel was ethically obligated to withdraw from representing him and to testify as a witness in the penalty phase, thus generating a conflict between the obligation and his self-interest in maintaining employment on the case. An attorney must withdraw from representation, absent the client's informed written consent, whenever he or she knows or should know he or she ought to be a material witness in the client's cause. (Rules Prof. Conduct, rule 5-210; see *Comden v. Superior Court* (1978) 20 Cal.3d 906, 911, fn. 1 [145 Cal.Rptr. 9, 576 P.2d 971] [motion to disqualify opposing counsel].) The determination whether an attorney ought to testify ordinarily is based on an evaluation of all pertinent factors, including the significance of the matters to which the attorney might testify, the weight the testimony might have in resolving such matters, and the availability of other witnesses or documentary evidence by which these matters may be independently established. (*Comden, supra,* at p. 913.) An attorney should "resolve any doubt in favor of preserving the integrity of his testimony and against his continued participation as trial counsel." (*Id.* at p. 915.)

Applying the *Comden* factors in the context of this case, we conclude counsel had no duty to withdraw and testify. The essence of the case in mitigation was a description of defendant's mental state and a chronicle of its deterioration in the preceding several years. To that end, counsel presented

the expert testimony of Dr. Wilkinson, who reviewed voluminous reports and records and recounted at length his own observations of defendant during the course of multiple interviews. Counsel had, as defendant states, some unique personal knowledge, to which he testified during the competency trial, of the same general subject matter. He therefore could have given relevant testimony during the penalty phase. But section 190.3, factor (k), permits the jury to consider a virtually unlimited range of mitigating evidence (e.g., *People v. Smithey* (1999) 20 Cal.4th 936, 1007 [86 Cal.Rptr.2d 243, 978 P.2d 1171]), and trial counsel in every case has unique personal knowledge of the defendant that conceivably might be relevant or useful in the penalty phase. We have never suggested that counsel therefore must withdraw from penalty phase representation and testify on the defendant's behalf, and we reject any such implication now.

Moreover, in this context, a contrary rule would be undesirable (in that a defendant may benefit from having the same attorney both testify in competency proceedings and continue representing the defendant during a later penalty phase) and inefficient (in that it would almost certainly necessitate delays while replacement trial counsel familiarized himself or herself with the case). While other factual scenarios may give rise to an actual conflict that requires counsel to withdraw from further representation after testifying in a competency trial in order to give unique and compelling testimony again in the penalty phase, this case is not one of them.

Because the fact that counsel testified during the competency phase did not create an obligation to withdraw from representation and testify about the same matters during the penalty phase, counsel did not labor under an actual conflict of interest in failing to do so.

Could there, nevertheless, have existed a potential conflict requiring the trial court to conduct an inquiry, or take remedial action? We look to whether facts known to the trial court raised the possibility of a conflict of interest obliging it to inquire further. (*Wood v. Georgia* (1981) 450 U.S. 261, 272 [67 L.Ed.2d 220, 101 S.Ct. 1097].) Defendant contends certain actions and omissions by counsel during the penalty trial, all of which were known to the trial court, showed that his performance was adversely affected by the purported conflict, obligating the court to inquire. These included counsel's (1) failure to introduce gibberish written by defendant and medical records from defendant's hospitalizations under Welfare and Institutions Code section 5150, (2) failure to have other competency phase witnesses testify, (3) failure to seek the appointment of associate counsel under *Keenan v. Superior Court* (1982) 31 Cal.3d 424 [180 Cal.Rptr. 489, 640 P.2d 108], (4) disparagement of defendant during guilt phase arguments, and (5) entering into a stipulation assertedly adverse to defendant's interests.

Because the competency hearing and the penalty trial served different purposes, the circumstance that Defense Attorney Gray did not present, during the penalty phase, all of the evidence introduced in the competency hearing is unsurprising and cannot necessarily be attributed to a conflict. Among the competency phase witnesses, for example, Attorney Thomas Nolan testified about the requirement that a criminal defendant be able rationally to assist his counsel in his own defense, an issue relevant only to the competency phase. We see no basis to conclude an unconflicted attorney would have called Nolan to testify in the penalty phase. Dr. Levy's competency phase testimony that defendant was incompetent was substantially similar to Dr. Wilkinson's, and an unconflicted attorney quite properly could have chosen to present only the latter in the penalty phase.

Defense Attorney Gray's decision not to introduce into evidence defendant's hospital records during the penalty phase is one that unconflicted counsel quite conceivably would make for tactical reasons, given the multiple references in those records to a possible motive for malingering (defendant's expressed fear of receiving the death penalty); a reference to defendant's talking to other psychiatric patients about the " 'rationale' for insanity pleas"; and a clinician's note theorizing that defendant's behavior was "probably related to current court action regarding his mental status." We do not share defendant's view that Gray's failure to introduce defendant's "word salad" writings indicated he was pulling his punches, given that Gray presented other evidence, in the form of Dr. Wilkinson's testimony, regarding the occurrence and significance of loose associations in defendant's communications.

What defendant characterizes as disparagement during Defense Attorney Gray's guilt phase arguments was, in context, an effort to get the jury to look skeptically at aspects of defendant's confessions that the prosecution argued pointed strongly toward a finding of premeditation and deliberation. Counsel with no conceivable conflict also might well have characterized his client as a liar and as seriously disturbed in an effort to obtain a second degree murder verdict in a case involving strong evidence of premeditation.

We see nothing in Defense Attorney Gray's failure to request the appointment of a second attorney to assist him (see *Keenan v. Superior Court, supra*, 31 Cal.3d at p. 430) that suggests a conflict of interest. For all that appears on the record, this case was relatively uncomplicated, and the need for second counsel is not apparent.

And although defendant insists the stipulation formulated by Defense Attorney Gray adversely affected his interests, in that it essentially told the jury he had willfully refused to cooperate with Gray, the jury could instead

have interpreted it as describing defendant's increasing inability, as the case progressed, to assist his counsel in a rational manner.

In sum, defendant fails to demonstrate that Defense Attorney Gray had a potential conflict of interest into which the trial court had a duty to inquire.

### 2. Asserted instructional errors

#### a. Section 71 offense as aggravating evidence

Defendant contends the trial court erroneously instructed the jury that it could consider in aggravation evidence that he threatened violence against a public officer. We disagree.

Section 190.3, factor (b), permits the prosecution to introduce evidence, during the penalty phase of a capital case, of other "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence." Here, the prosecutor presented the testimony of Angela Beck, a county-employed registered nurse who on March 3, 1989, was assigned to work in the county jail. Her duties included passing medication to prisoners, evaluating their medical and psychiatric needs, and noting any refusal of medication in the prisoner's medical chart. Beck testified that on that date she offered defendant, who was behind a locked door in the lockup area of the jail, his prescribed psychotropic medication. Defendant refused to take it, and Beck asked him why, stating a psychiatrist would want to know. Defendant looked at her and said, in a hostile manner, "If you talk to my psychiatrist, I will kill you." Beck testified she took the statement seriously, made an entry to that effect in the jail records, and mentioned the incident to her supervisor.

Defendant argues nurse Beck's testimony did not constitute substantial evidence of a violation of section 71, which provides that one is guilty of a public offense who, with the requisite intent, attempts to cause, or causes, any public officer or employee to do or refrain from doing any act in the performance of his or her duties by means of a threat, directly communicated to such person, to inflict an unlawful injury on any person or property, and it reasonably appears to the recipient that the threat could be carried out. Specifically, defendant asserts there was no substantial evidence that Beck reasonably could have believed he would carry out the threat or actually believed he intended to kill her, particularly because he was then confined behind a locked door; that he harbored the requisite intent to interfere with her performance of her duties; or that the threat related to something connected with Beck's duties. Consequently, defendant contends the trial court erred in instructing the jury that "the prosecution has presented

evidence implicating the defendant in other criminal acts," followed by an instruction (the substance of which he does not challenge) on threatening a public officer.

Most of defendant's attacks on the sufficiency of proof of the various elements of the offense lack merit. For example, contrary to defendant's argument, the record does not lack evidence that nurse Beck *actually* believed he would try to kill her: in fact, she testified she took the threat seriously and reported it to her supervisor and in the jail log. Nor is evidence lacking that defendant intended to interfere with Beck's performance of her official duty to report inmates' refusals of prescribed medication. Defendant errs in suggesting the relevant duty was that of prodding defendant into taking medications he did not wish to take, and his claim that he could not have threatened Beck for reporting what he all along wanted his psychiatrist to know, i.e., that he did not wish to take his medications, simply flies in the face of Beck's testimony regarding the words he used.

Defendant's assertion that he could not, consistent with the First Amendment, be found to have threatened a public officer fails, because true threats are not constitutionally protected. (*In re M.S.* (1995) 10 Cal.4th 698, 710 [42 Cal.Rptr.2d 355, 896 P.2d 1365]; see *People v. Toledo* (2001) 26 Cal.4th 221, 228–229 [109 Cal.Rptr.2d 315, 26 P.3d 1051].) A statute may constitutionally criminalize threats, even without a requirement of immediacy or imminence, if it includes a requirement of specific intent and present or apparent ability to carry out the threat. (*In re M.S., supra,* 10 Cal.4th at pp. 711–713.) Section 71 requires the intent to cause a public officer or employee to do or refrain from doing any act in the performance of his or her duties, and requires that it reasonably appear to the recipient that the threat could be carried out. The statute thus satisfies the First Amendment concerns addressed in *In re M.S., supra,* 10 Cal.4th 698, and does not punish a defendant for engaging in protected speech. The jury was instructed in the language of the statute, and for a juror to have considered the Beck incident in aggravation of penalty, he or she necessarily would have had to find each element of the offense, including the required intent and apparent ability, true beyond a reasonable doubt.

The sufficiency of the proof of one element of the offense—that of the *reasonableness* of the recipient's belief that the threat would be carried out—is a closer question because, when defendant uttered the threat, he was behind a locked door and thus could not at that moment harm nurse Beck. This circumstance is not dispositive, however. In *People v. Boyd* (1985) 38 Cal.3d 762 [215 Cal.Rptr. 1, 700 P.2d 782], we noted that the prosecution's proof of an asserted violation of section 71 was deficient, in that the defendant was locked in his cell at the time he made the alleged threat and

thus was not then "in a position to carry out the threat." (38 Cal.3d at p. 777.) In *People v. Tuilaepa* (1992) 4 Cal.4th 569 [15 Cal.Rptr.2d 382, 842 P.2d 1142], we cited the fact that the defendant was locked in his cell for the night when he threatened to burn a pair of pants and an adviser's face, along with the absence of a "substantial showing that [the] defendant harbored the requisite intent—interfering with the performance of official duties"—in rejecting the Attorney General's contention the threats in that case violated section 71. (4 Cal.4th at p. 590.) In neither case, however, did we consider that section 71, unlike section 422 (prohibiting criminal threats) and section 404.6 (prohibiting inciting to riot) contains no requirement of immediacy. (See *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1139 [105 Cal.Rptr.2d 165]; *In re Marcus T.* (2001) 89 Cal.App.4th 468, 472 [107 Cal.Rptr.2d 451].) Indeed, the statute expressly provides that the threat may be communicated by "telephone, telegraph, or letter" (§ 71)—clearly indicating the Legislature did not intend to require that the defendant have the capability to inflict the threatened unlawful injury *immediately*. Provided the defendant harbors the requisite intent and, to the recipient, it reasonably appears the threat *could be* carried out, that the defendant uttered it from behind a locked door does not preclude a determination that he violated section 71.

Nevertheless, whether the record in this case contains sufficient evidence that nurse Beck could have reasonably believed defendant could carry out his threat is arguable. The prosecutor suggested to the jurors that jail inmates on occasion leave their cells and meet with nurses, but as defendant points out, there was no testimony establishing he ever had physical contact with Beck or any other nurse dispensing psychotropic medication, or any evidence of circumstances under which he might have been outside his cell, unrestrained, in a place where he could have attacked Beck. Thus, although Beck testified defendant delivered the threat in a "very hostile" manner and she took it seriously, reported it in jail records, and told her supervisor about it, that the jury could have found all of the elements of a violation of section 71 on these facts is open to question.

Nevertheless, we see no reasonable likelihood the giving of the instruction (which, as defendant appears to concede, correctly defined the offense) misled the jury in its penalty determination. (*People v. Clair, supra*, 2 Cal.4th at p. 663.) As noted, the jury was instructed not to consider the evidence regarding the threat to nurse Beck unless it found the prosecution had proven all the elements of a violation of section 71 beyond a reasonable doubt. We presume it followed those instructions. (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 44.) Even assuming error in the giving of the instruction, we see no reasonable possibility defendant would have obtained a more favorable outcome in its absence, given the great weight of the aggravating evidence against him. (*People v. Brown* (1988) 46 Cal.3d 432, 446–449 [250 Cal.Rptr. 604, 758 P.2d 1135].)

### b. *Residential burglary as aggravating evidence*

During the penalty phase, the prosecution presented evidence that defendant committed burglary on April 4, 1985. On that date, defendant and Officer Lisa Thomas, who was working undercover and posing as defendant's friend, spent several hours at the Wit's End bar. Defendant talked at length about breaking into houses, telling Thomas that, among other things, it was better to do it at night, that one should stake out the house in order to learn the residents' patterns, that if a child lived in the house one was burglarizing, he or she could be tied up and made to tell where items were and the police would not consider the child a reliable witness. Defendant discussed alarm systems and methods of getting away from the scene of a burglary. He told Thomas they should not smoke marijuana for at least two days before committing any burglaries. After four or five hours at the Wit's End, defendant and Thomas went to Goethe Park and walked for about an hour and a half on a trail that ran along the river. Defendant seemed to sober up during this time. Returning to the park entrance, defendant saw a house on the corner with a "bug zapper" with bright blue lights in the yard. Defendant went into the yard and called to Thomas, saying he had found an unlocked door and wanted to go in and take a stereo. He instructed her to act as a lookout and left her to enter the house. Sergeant Goulart, meanwhile, was conducting electronic surveillance, and Thomas, using a wireless transmitter, told him of defendant's plan. Thomas ran to a neighboring house, woke the residents and used their telephone to call the sheriff's office.

Sergeant Goulart testified that he had followed defendant and Thomas since 3:00 p.m. that day, listening to their conversation over the wireless transmitter. When he saw defendant enter the house through a sliding door around 11:00 p.m., he told Thomas to go down the block and call the sheriff's office. After four or five minutes, Goulart saw defendant run out of the house. Goulart shined a flashlight on defendant's face, identified himself as a police officer, and ordered defendant to the ground. He then physically forced defendant down, dragged him back to the house, and yelled to the residents for assistance.

The house defendant had entered belonged to Richard Rennie, who lived there with his family. When the Rennies went to bed around 11:00 p.m., Mr. Rennie checked on his daughter and made sure her comforter was atop her bed. Ten to 15 minutes later, Rennie heard a commotion and went downstairs to investigate, stepping on something in the hallway on the way. Turning on the light, he saw Sergeant Goulart trying to handcuff defendant. Rennie noticed a pair of scissors lying in the middle of the family room floor, out of its customary place in the dining room. Going upstairs later, Rennie noticed his daughter's quilt, on which he had stepped, lying in the hall halfway out of her room.

As relevant to the evidence of the Rennie incident, the trial court instructed the jury with language adapted from CALJIC No. 14.50 on burglary for theft. The trial court also instructed the jury with the language of section 190.3, factor (b), which, as noted, directs the jury to consider the presence or absence of criminal activity by the defendant, other than the crimes for which he was tried in the present proceedings, that involved the use or attempted use of force or violence or the express or implied threat to use force or violence. Defendant makes two related claims of error: (1) the instruction on burglary for theft improperly permitted the jury to find an aggravating factor based on an offense not involving the use or threat of force or violence against a person, in violation of section 190.3, factor (b), an error he asserts was compounded by the trial court's failure to define the term "express or implied threat to use force or violence"; and (2) any instruction on burglary was improper because the evidence failed to show that any force or violence was used or threatened in the course of the incident. These errors, he contends, violated state law and deprived him of a reliable verdict as guaranteed by the Eighth and Fourteenth Amendments to the federal Constitution. We find no error.

■ To the extent defendant is arguing that burglary for theft categorically is an offense not involving force or violence, and therefore can never be the subject of a section 190.3, factor (b) instruction, he is mistaken. (See *People v. Montiel* (1993) 5 Cal.4th 877, 936 [21 Cal.Rptr.2d 705, 855 P.2d 1277] [residential burglary in which the defendant displayed a knife to the resident involved actual or threatened violence, and evidence thereof was admissible under factor (b)].) Whether such a burglary "involves" force or violence, and thus qualifies as an aggravating factor under factor (b), depends on the circumstances of its commission.

■ Defendant's contention that the trial court erred in failing to define "express or implied threat to use force or violence" in the context of a section 190.3, factor (b) burglary likewise lacks merit. He cites no decision, and we have found none, holding that the phrase must be defined for the jury. It is self-explanatory. In rejecting a claim that factor (b) is unconstitutionally vague, the high court in *Tuilaepa v. California* (1994) 512 U.S. 967 [129 L.Ed.2d 750, 114 S.Ct. 2630], noted it is phrased in "conventional and understandable terms" (*id.* at pp. 976, 977) and affirmed that it possesses a " 'common-sense core of meaning . . . that criminal juries should be capable of understanding.' " (*Id.* at p. 975.)

Furthermore, we agree with the Attorney General that, although the portion of the instructions defining burglary, in isolation, did not refer to the "force or violence" requirement, nevertheless, when read together, the burglary instruction, the general section 190.3, factor (b) instruction, and CALJIC No. 8.87

adequately conveyed to the jury that before it could consider the Rennie incident in aggravation it had to find, beyond a reasonable doubt, all of the elements of the offense of burglary and that the offense involved the use or attempted use of force or violence, or the express or implied threat to use force or violence.

Defendant's remaining contention, that the evidence failed to show any force or violence was used or threatened in the course of the Rennie burglary, fails. Richard Rennie testified that after defendant was apprehended, Rennie found a pair of scissors lying on the floor, away from its usual place in the dining room, and his daughter's quilt lay on the floor, halfway out of her bedroom. Officer Thomas testified that while she was working undercover before the Rennie incident, defendant spoke with her about the possibility of committing burglaries, telling her, in effect, that the police do not take 12-year-old children seriously as witnesses, and that if a child were present at a burglary he or she could be tied up or handcuffed and questioned about the location of items in the house. Seen in the context of defendant's musings about restraining a child to facilitate stealing a family's valuables, Rennie's testimony supported an inference that defendant armed himself with the scissors, entered the sleeping girl's bedroom and disturbed her quilt before being interrupted and attempting to leave the house. That other inferences could, as defendant suggests, be drawn from these facts does not mean the instruction was improper. In sum, there was evidence sufficient to support a jury finding that defendant attempted to use force or violence in committing the burglary, and the jury was properly instructed under section 190.3, factor (b).

### c. *Mental illness as aggravating factor*

Defendant contends that CALJIC Nos. 8.85 and 8.88, as read to the jury during the penalty phase, improperly permitted consideration of his mental illness as an aggravating factor, in violation of the Sixth, Eighth and Fourteenth Amendments to the federal Constitution and state death penalty law. He asserts that nothing in the instructions drawn from section 190.3, factors (a), (b), (d), and (h) expressly informed the jury that evidence of his mental illness and the role it may have played in the commission of his offenses could be considered only in mitigation, and that the evidence in this case—including expert testimony that defendant's mental illness caused him to hate the victims with a homicidal rage he could not control—could have led the jury to see him as worthier of a death verdict because of his illness. Defendant acknowledges that *Tuilaepa v. California, supra,* 512 U.S. at page 979, held those sentencing factors facially constitutional, but contends the high court there did not face circumstances similar to those here, where the instructions did not preclude the jury from treating as aggravating evidence

that, he contends, constitutionally can only mitigate penalty. Defendant also acknowledges our decisions in *People v. Benson* (1990) 52 Cal.3d 754, 801–803 [276 Cal.Rptr. 827, 802 P.2d 330], and *People v. McPeters* (1992) 2 Cal.4th 1148, 1191 [9 Cal.Rptr.2d 834, 832 P.2d 146], holding that penalty phase jury instructions need not explicitly label a factor such as extreme mental or emotional disturbance as mitigating, provided there is no reasonable likelihood jurors misunderstood the instruction in a way that violated the defendant's rights, but he likewise distinguishes those cases as not involving evidence of particular manifestations of mental illness that jurors could have seen as rendering defendant exceptionally dangerous and deserving of death.

The Attorney General contends the contention is forfeited for purposes of this appeal under the invited error doctrine (see *People v. Wader* (1993) 5 Cal.4th 610, 657–658 [20 Cal.Rptr.2d 788, 854 P.2d 80]) because trial counsel stated he had no objection to the instructions being given. On the record before us, the invited error doctrine is inapplicable, as it does not appear trial counsel both " 'intentionally caused the trial court to err' " and clearly did so for tactical reasons. (*People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 49.) We therefore address the argument on its merits (see § 1259; *People v. Prieto, supra*, 30 Cal.4th at p. 247) and, as will appear, reject it.

We previously have rejected the contention that the standard instruction based on section 190.3, factor (d) improperly allows the jury to consider evidence of mental illness in aggravation. (*People v. Carpenter* (1997) 15 Cal.4th 312, 420 [63 Cal.Rptr.2d 1, 935 P.2d 708]; *People v. McPeters, supra,* 2 Cal.4th at p. 1191; see also *People v. Smith* (2005) 35 Cal.4th 334, 352–356, 360–361 [25 Cal.Rptr.3d 554, 107 P.3d 229] [although evidence of mental illness as extreme mental or emotional disturbance, under section 190.3, factor (d), or as a circumstance extenuating the gravity of the crime, under section 190.3, factor (k), can only be mitigating, if evidence of a defendant's mental illness relates to an aggravating factor such as section 190.3, factor (a), the circumstances of the offense, the prosecution may introduce it during its penalty phase case-in-chief, even if the evidence also bears upon a mitigating factor listed in that section, and the jury may be instructed accordingly].) Defendant offers no persuasive reason to depart from that conclusion.

Nothing in the prosecution's evidence or argument in this case suggested that defendant's mental illness should be considered in aggravation. Certain evidence that defendant cites in support of this argument—Dr. Missett's opinion that defendant was "evil" and acted out of a homicidal rage toward his victims—was elicited *by the defense on cross-examination*, apparently in an effort to show the witness's bias. Of the other evidence that defendant

cites—psychiatric opinions that the murder of Sean Dannehl reflected sexual sadism and Dr. Wilkinson's diagnosis of paranoid schizophrenia—none was argued as an aggravating factor. Thus, we see no reasonable likelihood the jury considered evidence of defendant's mental illness as aggravating. (*People v. Carpenter, supra,* 15 Cal.4th at p. 420.)

To the extent defendant is arguing that the instructions improperly permitted the jury to consider evidence of his mental illness in determining whether he had committed other violent criminal acts within the meaning of section 190.3, factor (b), we see no error. The jury was correctly instructed on the elements of the factor (b) offenses, and defendant shows no reasonable likelihood that the evidence of his current mental illness would have affected their determination whether the prosecution had proven beyond a reasonable doubt he committed those offenses, so as to permit the jury to consider them in aggravation. (*People v. Clair, supra,* 2 Cal.4th at p. 663.)

> d. *Permitting consideration of sympathy for victims and their families*

Defendant contends that CALJIC No. 8.88, as given in this case, improperly allowed the jury to base its penalty determination on an emotional reaction unrelated to his personal culpability, namely sympathy for the families of the victims. He observes that the instruction told jurors to "assign whatever moral or sympathetic value [they] deem[ed] appropriate to each and all of the various factors [they were] permitted to consider," which included section 190.3, factors (a) (circumstances of the offense) and (b) (other violent criminal conduct).

Although a jury must never be influenced by passion or prejudice, at the penalty phase of a capital case a jury may properly consider in aggravation, as a circumstance of the crime, the impact of a capital defendant's crimes on the victim's family, and in so doing may exercise sympathy for the defendant's murder victims and for their bereaved family members. (*People v. Pollock* (2004) 32 Cal.4th 1153, 1195 [13 Cal.Rptr.3d 34, 89 P.3d 353].) Consequently, CALJIC No. 8.88 is not flawed in permitting the jury to do so. We see nothing in the instruction or prosecutorial argument in this case that invited the jury to decide the penalty on the basis of passion or prejudice. We therefore reject defendant's contention.

> e. *Misleading jury as to extent of mitigating evidence*

The trial court instructed the jury, in the language of section 190.3, factor (k), that in determining the appropriate penalty it could consider "any other circumstance which extenuates the gravity of the crime even though it is not

a legal excuse for the crime, and any sympathetic or other aspect of the defendant's character or record that the defendant offers as a basis for a sentence of less than death, whether or not related to the offense for which he is on trial." Defendant acknowledges that this language, taken from *People v. Easley* (1983) 34 Cal.3d 858, 878, footnote 10 [196 Cal.Rptr. 309, 671 P.2d 813], and derived from *Lockett v. Ohio* (1978) 438 U.S. 586, 604 [57 L.Ed.2d 973, 98 S.Ct. 2954], "in the vast majority of situations," "will not mislead the jury" because defense counsel generally will argue, as a basis for a sentence less than death, all mitigating factors supported by the evidence. He asserts the contrary is true here because his counsel argued only defendant's current mental illness as a reason for the jury to spare him the death penalty, and failed to present evidence of other possible mitigating factors, such as the role of defendant's intoxication in the capital crimes and in some of his unadjudicated criminal conduct. Defendant notes that the prosecution's penalty phase case-in-chief did include such potentially mitigating evidence, but asserts the factor (k) instruction precluded the jury from considering it.

The Attorney General argues defendant may not raise this contention on appeal because his counsel stated he had no objection to the giving of the section 190.3, factor (k) instruction. For the reasons given above in connection with defendant's claim that the instructions improperly permitted evidence of mental illness to be used in aggravation (see *ante,* at pp. 924–925), we disagree.

On the merits, however, we see no reasonable likelihood (*People v. Clair, supra,* 2 Cal.4th at p. 663) the jury understood the instructions in the manner defendant suggests. The instructions did not tell the jury not to consider any of the mitigating factors. Indeed, they directed the jury to consider all of the evidence received during any part of the trial, enumerated the statutory mitigating and aggravating factors, and advised the jury it was free to assign whatever moral or sympathetic value it deemed appropriate to each of the factors it was permitted to consider. (§ 190.3; CALJIC No. 8.88.) As discussed, at the guilt phase the jury heard about defendant's consumption of alcohol and his use of marijuana before committing the Davies and Turner murders. As the Attorney General observes, moreover, in his summation the prosecutor discussed the various statutory mitigating factors, arguing either that the evidence did not support the existence of the factor (extreme mental or emotional distress at the time of the offenses, and whether defendant's ability to appreciate the criminality of his conduct was affected by mental disease or defect or intoxication) or that the factor was entitled to little weight (the absence of any prior felony convictions). There is no reasonable likelihood the instruction caused the jury not to consider any mitigating evidence in the record.

f. *Failure to give CALJIC No. 2.01 or 2.02*

Defendant contends the trial court erred in failing to instruct the jury with the portion of CALJIC No. 2.01 that states: "[A] finding of guilt as to any crime may not be based on circumstantial evidence unless the proved circumstances are not only (1) consistent with the theory that the defendant is guilty of the crime, but (2) cannot be reconciled with any other rational conclusion." Alternatively, he contends the court should have given the corresponding portion of CALJIC No. 2.02. Its failure to do so, he argues, prejudicially violated state law and the Sixth, Eighth and Fourteenth Amendments to the federal Constitution and requires reversal. We disagree.

The Attorney General urges that defendant invited any error by asking that CALJIC Nos. 2.01 and 2.02 not be given. Defendant acknowledges that, at the penalty phase instructions conference, his trial counsel initially requested that CALJIC Nos. 2.01 and 2.02, along with other instructions pertaining to the elements of the section 190.3, factor (b) offenses the prosecutor proved in the penalty phase, not be given. Later, the court and counsel agreed that the jury should be instructed on the elements of the factor (b) offenses. From this circumstance, defendant argues that his trial counsel withdrew his objection to, and should be understood to have affirmatively asked for, CALJIC Nos. 2.01 and 2.02.

We read the record differently. After agreeing that the jury should be instructed on the elements of the section 190.3, factor (b) offenses (murder [CALJIC Nos. 8.10 and 8.11], burglary [CALJIC No. 14.50], attempt [CALJIC Nos. 6.00 and 6.01] and threatening a public officer [in the language of section 71]), the court and counsel again reviewed other potentially applicable instructions and concluded that several of them should be given (CALJIC Nos. 2.70 [confessions and admissions], 2.72 [corpus delicti], 3.31 [concurrence of act and specific intent], 2.80 [expert testimony], 2.82 [hypothetical questions], 2.83 [resolution of conflicting expert testimony], 2.90 [reasonable doubt], 8.85 [factors for consideration in determining penalty], and 8.87 [standard of proof beyond a reasonable doubt for other criminal activity]). Thus, that counsel individually considered potentially applicable penalty phase instructions is clear, and his agreement to several other instructions, after having disclaimed a wish to have the trial court instruct the jury with CALJIC Nos. 2.01 and 2.02, cannot be interpreted as a request that they be given.

In any event, the trial court did not err in failing to instruct the jury with CALJIC No. 2.01 or 2.02. Such instructions are required only when the prosecution substantially relies on circumstantial evidence. (*People v. Brown* (2003) 31 Cal.4th 518, 563 [3 Cal.Rptr.3d 145, 73 P.3d 1137].) When

"circumstantial inference is not the primary means by which the prosecution seeks to establish that the defendant engaged in criminal conduct, the instruction may confuse and mislead, and thus should not be given." (*People v. Anderson* (2001) 25 Cal.4th 543, 582 [106 Cal.Rptr.2d 575, 22 P.3d 347].) Here, to prove the section 190.3, factor (b) offenses the prosecution relied primarily on direct evidence: defendant's confession to murdering Sean Dannehl and deliberately running over Steve Murphy; Monte Hansen's testimony that defendant hit him with a board; Angela Beck's testimony that defendant threatened her; and the testimony of Belmont Police Detectives Goulart and Thomas, along with defendant's tape-recorded conversation with Thomas, concerning the Rennie burglary. Defendant argues that his guilt of those offenses turned entirely on his mental state, which was susceptible of proof only by circumstantial evidence. We disagree. In a case addressing the question whether CALJIC No. 2.01 was required to be given in a noncapital criminal trial, we reasoned: "The fact that the elements of a charged offense include mental elements that must necessarily be proved by inferences drawn from circumstantial evidence does not alone require an instruction on the effect to be given such evidence however. The contrary is usually the rule. . . . [¶] In the instant case the instructions were unnecessary because the People did not 'substantially rely' on circumstantial evidence, and . . . the evidence as to the mental elements of murder was either direct evidence, or if circumstantial was not equally consistent with a rational conclusion that appellant was innocent of murder under either of the theories pursued by the People." (*People v. Wiley* (1976) 18 Cal.3d 162, 175 [133 Cal.Rptr. 135, 554 P.2d 881].) The same reasoning applies to this case. To the extent the evidence of defendant's mental state during the section 190.3, factor (b) offenses was circumstantial, it was not equally consistent with a rational finding of innocence. Hence, the trial court did not err in failing to instruct with CALJIC Nos. 2.01 and 2.02. Nor was there any constitutional violation.

### g. Instruction on expert testimony

Defendant here contends, as he did in connection with the giving of the same instruction given in the competency phase (see pt. II.A.2.h, *ante*), that the trial court erred in telling the jury that in assessing the testimony of an expert, it should consider the expert's opinion with the reasons given for it, without explicitly instructing the jury to consider the facts on which the opinion was based. For the reasons we rejected the contention above, we do so again here.

### h. Preinstruction during voir dire

During voir dire, the trial court distributed to prospective jurors a printed instruction regarding the penalty phase, which stated: "In the penalty phase of

the trial both counsel are permitted to introduce mitigating and aggravating evidence about the defendant. Aggravating circumstances may involve other bad acts, different from the offense(s) charged. Mitigating circumstances could be psychiatric testimony or other sympathetic factors in a defendant's life. If you[] are selected as a juror in this case you must, by law, consider these mitigating and aggravating factors along with the facts of the case in making a decision about the penalty to be imposed."

Defendant contends this instruction was prejudicially inaccurate. He observes that its description of possible mitigating circumstances was incomplete, in that mitigation can encompass any and all factors that jurors perceive as extenuating a defendant's conduct. Indeed, he contends the mitigating evidence presented to the jury included abundant evidence falling outside the narrow categories enumerated by the trial court, including his asserted intoxication at the times of the offenses, the mental disease or defect he asserts caused him to become assaultive when intoxicated, and his confession to the crimes, which assisted police investigations and brought closure to the victims' families. The underinclusiveness of the instruction, he contends, violated his rights under the Eighth and Fourteenth Amendments because it effectively precluded the sentencer from considering as mitigating any circumstance of the offense proffered as a reason for a sentence less than death. (*Lockett v. Ohio, supra*, 438 U.S. at p. 601.)

Although defendant did not object to this preinstruction or request clarification, we do not deem forfeited any claim of instructional error affecting a defendant's substantial rights. (§ 1259; *People v. Coffman and Marlow, supra*, 34 Cal.4th at p. 104, fn. 34.)

On the merits, however, we conclude the preinstruction did not prejudice defendant. As we said in assessing a similar claim in *People v. Livaditis, supra*, 2 Cal.4th 759: "The comments were not the actual complete jury instructions. The full instructions came at the end of the trial . . . . [¶] 'The purpose of these comments was to give prospective jurors, most of whom had little or no familiarity with courts in general and penalty phase death penalty trials in particular, a general idea of the nature of the proceeding. The comments were not intended to be, and were not, a substitute for full instructions at the end of the trial.' " (*Id.* at p. 781.) Likewise here, at the conclusion of the penalty phase the trial court read the complete standard instructions on aggravating and mitigating factors and determining penalty. (CALJIC Nos. 8.85, 8.88.) The court also instructed the jury to disregard all other instructions given in other phases of the trial. Thus, there is no reasonable likelihood (*People v. Clair, supra*, 2 Cal.4th at p. 663) the jury understood the instruction given during the voir dire process as restricting the range of mitigating evidence it could consider in deliberating on penalty.

3. *Asserted errors in proceedings on automatic application to modify verdict*

Defendant contends that proceedings on the automatic application to modify the verdict under section 190.4, subdivision (e) were so affected by a variety of errors that remand for a new hearing on the application is required. We independently consider the record in reviewing the trial court's ruling. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1091 [119 Cal.Rptr.2d 859, 46 P.3d 335].) As will appear, we find no error warranting reversal.

a. *Counsel's inaction*

First, citing *United States v. Cronic* (1984) 466 U.S. 648, 655–657, 659–660 [80 L.Ed.2d 657, 104 S.Ct. 2039] (*Cronic*), defendant contends that his trial counsel's inaction—specifically, his filing no documents and making no argument—at this critical stage of the trial (see *Evitts v. Lucey* (1985) 469 U.S. 387, 393 [83 L.Ed.2d 821, 105 S.Ct. 830] [recognizing right to effective assistance of counsel in first appeal as of right]; *Mempa v. Rhay* (1967) 389 U.S. 128, 134–137 [19 L.Ed.2d 336, 88 S.Ct. 254] [recognizing right to counsel at sentencing]) led to a total breakdown of the adversarial process, requiring reversal without consideration of prejudice. (Defendant expressly makes no claim on appeal that his counsel was ineffective within the meaning of *Strickland v. Washington* (1984) 466 U.S. 668, 688 [80 L.Ed.2d 674, 104 S.Ct. 2052] (*Strickland*).)

In *Cronic*, the high court stated: " 'The right to the effective assistance of counsel is . . . the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing. When a true adversarial criminal trial has been conducted—even if defense counsel may have made demonstrable errors—the kind of testing envisioned by the Sixth Amendment has occurred. But if the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated.' " (*In re Avena* (1996) 12 Cal.4th 694, 727 [49 Cal.Rptr.2d 413, 909 P.2d 1017], quoting *Cronic, supra,* 466 U.S. at pp. 656–657, fns. omitted.) The high court gave examples of the ways in which a trial might cease to afford meaningful adversarial testing: " 'The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding.' . . . 'Apart from circumstances of that magnitude, however, there is generally no basis for finding a Sixth Amendment violation unless the accused can show how specific errors of counsel undermined the reliability of the finding of guilt.' " (*In re Avena, supra,* 12 Cal.4th at p. 727, quoting *Cronic, supra,* 466 U.S. at p. 659, fns. 25, 26, italics omitted.)

In *Bell v. Cone* (2002) 535 U.S. 685 [152 L.Ed.2d 914, 122 S.Ct. 1843] (*Cone*), the high court emphasized the narrowness of its holding in *Cronic*. "When we spoke in *Cronic* of the possibility of presuming prejudice based on an attorney's failure to test the prosecutor's case, we indicated that the attorney's failure must be *complete*." (*Id.* at pp. 696–697, italics added.) In mounting a guilt phase defense of insanity, defense counsel in *Cone* presented psychological and neuropharmacological evidence of the defendant's substance abuse and posttraumatic stress related to his military service in Vietnam, as well as testimony by the defendant's mother and evidence of remorse. During the sentencing hearing that followed the jury's verdict of guilty, defense counsel called the jurors' attention to the mitigating evidence they had heard in the earlier phase of trial and asked them to exercise mercy. Defense counsel objected to the prosecutor's proffer of photographs of the victims' decomposing bodies and, after the junior prosecuting attorney gave a "low-key" summation, waived closing argument, thereby foreclosing the lead prosecutor, who by all accounts was a highly effective advocate, from offering rebuttal. The high court rejected Cone's claim that his counsel failed to subject the prosecution's case to adversarial testing within the meaning of *Cronic*, reasoning that the claim was "not that his counsel failed to oppose the prosecution throughout the sentencing proceeding as a whole, but that his counsel failed to do so at specific points. For purposes of distinguishing between the rule of *Strickland* and that of *Cronic*, this difference is not of degree but of kind." (*Id.* at p. 697.)

This case is similar to *Cone*. After presenting a penalty phase defense of current mental illness via the testimony of Dr. Wilkinson and arguing his case to the jury, counsel appeared at the hearing on the automatic motion to modify and noted he had reviewed the prosecutor's proposed ruling and had nothing to add. After the trial court read its decision into the record, counsel reminded the court that he had asked it to defer reading the probation report until after ruling on the automatic application. The trial court responded that it had done so. Before the court recessed to consider the report, defense counsel pointed out a factual error in it.

 These circumstances, which show that defense counsel was present at and actively participating in the penalty trial as a whole, including the evidentiary portion and argument to the jury, do not reach the magnitude of those in which courts have concluded *Cronic* required reversal without a showing of prejudice. In particular, this is not a case like *People v. McKenzie* (1983) 34 Cal.3d 616 [194 Cal.Rptr. 462, 668 P.2d 769], disapproved on other grounds in *People v. Crayton* (2002) 28 Cal.4th 346, 365 [121 Cal.Rptr.2d 580, 48 P.3d 1136], a pre-*Cronic* decision in which we reversed a conviction after the defendant's counsel expressly refused to participate in the trial beyond appearing in the courtroom, and remained mute throughout the proceedings. In ruling on the automatic application, the trial court is limited

to the evidence that was before the jury; thus, trial counsel was not at liberty to present new evidence and clearly cannot be faulted for not doing so. (§ 190.4, subd. (e); *People v. Farnam* (2002) 28 Cal.4th 107, 196 [121 Cal.Rptr.2d 106, 47 P.3d 988].) Defendant's central complaint is that counsel did not argue to the trial court, orally or in writing, for reduction of his sentence. But during his penalty phase summation counsel had argued for a verdict of life imprisonment without possibility of parole based on the evidence he had presented during that phase of trial. That counsel did not repeat himself in the proceedings on the automatic application was not the equivalent of his being absent or failing to subject the prosecution's case to adversarial testing during the sentencing phase of trial. That counsel chose not to present argument at the hearing on the automatic application, moreover, meant that the prosecutor likewise would not enjoy another opportunity to urge the court to confirm the death sentence.

The authorities on which defendant relies, all of which predate *Cone, supra,* 535 U.S. 685, are distinguishable on their facts: In *Tucker v. Day* (5th Cir. 1992) 969 F.2d 155, 159, counsel at a noncapital resentencing hearing did not consult with the defendant, had no knowledge of the facts, and acted as a mere spectator of whose presence the defendant was unaware. In *Patrasso v. Nelson* (7th Cir. 1997) 121 F.3d 297, 304–305, counsel in a noncapital case performed no investigation before sentencing and made no effort to obtain a mitigated punishment. As noted, the facts of this case are distinguishable.

Our conclusion that the rule in *Cronic* does not apply here should not be read as an endorsement of defense counsel's performance in connection with the hearing on the automatic application to modify the verdict. Cases in which counsel at such hearings appropriately choose to forgo arguing that their client's life be spared should be rare indeed. As noted, this appeal affords us no occasion to comment on the adequacy of counsel's representation within the meaning of *Strickland, supra,* 466 U.S. at page 688. Resolution of any claim predicated on *Strickland* must await collateral proceedings.

### b. *Asserted conflict of interest*

Next, defendant contends the trial court erred in failing to modify the verdict due to counsel's conflict of interest (see *ante,* at pp. 913–918). Because we have concluded counsel did not have a conflict of interest, we reject the contention.

### c. *Trial court remarks suggesting role of emotion or religious belief in ruling*

Defendant next argues he was denied due process of law because the judge's decision on the automatic application to modify the verdict was

tainted by passion, emotion, and religious beliefs. He cites several remarks the trial court made during the sentencing hearing.

First, in examining section 190.3, factor (d)—whether the murders were committed while defendant was under the influence of extreme mental or emotional disturbance—the court stated: "There is no evidence that the murders of John Davies and Lance Turner were committed while the defendant was under the influence of extreme mental or emotional disturbance. Even the doctors most favorable to the defendant testified that Jon Dunkle showed no signs of mental illness until 1987. [¶] *Those of us who are overcome by the horror of these crimes* may have an urge to imagine that Jon Dunkle suffered from some emotional illness[;] perhaps we do this to protect ourselves from the very real fact that some people in this world delight in doing evil. [¶] However, evidence indicates that the defendant has systematically feigned mental problems in order to avoid responsibility for his vicious acts." (Italics added.)

Defendant argues the italicized phrase shows that the court's ruling was improperly based on its personal emotion. But he takes this comment out of context. The ruling as a whole makes clear that the court carefully considered all of the evidence presented at trial, applying the section 190.3 factors in exercising its independent judgment to determine that the weight of the evidence supported the jury's verdict. We see no basis for a conclusion the trial court improperly took emotional considerations into account in making its ruling.

Defendant further asserts that the court's discussion of section 190.3, factor (a), the circumstances of the offenses, revealed that emotion and passion affected the ruling. The court stated: "The circumstances of the crime for which the defendant was convicted were particularly vicious. The first of the defendant's chosen victims, John Davies, was especially vulnerable to the defendant's murderous intentions because he regarded the defendant as a friend. He trusted Jon Dunkle. The defendant used this trust, as well as John Davies' youth, to lure him to an isolated area, and there for pleasure, Jon Dunkle murdered his friend. [An] incomprehensible and vicious act. Having accomplished that, he abandoned John's body to the elements, *he cruelly allowed the family who had welcomed him to be torn apart by years of searching and heart-[rending] sor[r]ow*. [¶] Then the defendant in 1984 murdered again. As before the defendant chose a particularly vulnerable victim, a 12-year-old boy, Lance Turner. A child whom the defendant had never before seen. For a thrill, the defendant brutally stabbed Lance 23 times. For the perverse pleasure of seeing a human being suffer and die, Jon Scott Dunkle ended Lance's life *and plunged the Turner family into darkest grief.*" (Italics added.) Later, in the course of its comments on section 190.3, factor

(b), other violent criminal conduct, the court stated: "Proof beyond a reasonable doubt was also presented on a third murder committed by the defendant in 1985. The murder of Sean Dannehl. While the defend[ant] was living in Sacramento and [a]waiting court proceeding on the burglary charge, he happened upon his third victim, a slight 12-year-old boy, riding his bicycle home through the twilight. Jon Dunkle chased him on his own bike, rammed him twice, forcing Sean to stop. *Who can imagine the terror that that child must have felt naked, alone and trapped by this defendant? Jon Dunkle brutally and pitilessly stabbed Sean in the heart and eyes. He forcibly penetrated that little skull. He drained Sean's life from him, and left him to decompose in the summer heat.* [¶] The defendant confessed to this crime as well." (Italics added.)

The italicized comments reveal the court's appreciation of the terror and grief felt by the victims and their families. They do not support defendant's assertion that the court made its ruling on the basis of its personal emotion or passion.

Finally, defendant contends certain comments the court made after ruling on the automatic application and after imposing sentence, demonstrate that the court's emotional reactions and religious views improperly influenced its ruling. The court said: "To the families of John Davies and Lance Turner: The facts that were presented here in this courtroom constitute a tragedy of incomprehensible proportions. Our children are so much a part of ourselves, their personalities, their uniqueness, become woven into the fabric of our being. When that precious part of our lives is ripped ruthlessly [from] us, as happened in this case, the resulting wound must be beyond endurance. [¶] I know that I speak for each person who sat in the courtroom and listened to the evidence, when I say that our hearts go out to you. We hope now, that somehow the healing process can begin. [¶] We admire your courage and pure faith. You have born[e] unbearable sorrow with grace and dignity. [¶] To Jon Scott Dunkle I say do not look to this court for forgiveness, Mr. Dunkle. I can find no mercy for you in my heart. [¶] What you have done deserves the fullest condemnation of the law. The jury rightly determined that there is no penalty but death to be imposed in this situation and I concur with that determination. [¶] I suggest that you now look beyond this earth for forgiveness, for what is not possible for man is possible for God. When you were younger you went to church. You know that a judgment day that will make this pale in comparison is coming. Direct your thoughts to that judgment that you may not make a wreckage of your eternal life as you have this mortal life. [¶] Court is in recess."

As noted, the court made these comments *after* ruling on the automatic verdict modification application and *after* imposing sentence. In the course of

our review of the ruling, we have independently considered the record and the court's statement of its reasons for the ruling. (*People v. Holt* (1997) 15 Cal.4th 619, 710 [63 Cal.Rptr.2d 782, 937 P.2d 213].) We are satisfied the court complied with its obligation to weigh the evidence independently and without being influenced by improper religious or emotional considerations. Its postruling comments were personal reflections and not part of a legal ruling.

### d. *Asserted error in trial court's factual conclusions*

Defendant contends the trial court's ruling on the automatic application contained several factual errors that violated an Eighth and Fourteenth Amendment interest he discerns in the reliable implementation of the last procedural safeguard before imposition of the death penalty. We discuss each asserted error in turn.

Defendant criticizes the trial court's statement that "Nothing was presented to the jury to prove that [defendant] was under the influence at the time of the murder [of Lance Turner]." Defendant argues the trial court ignored the portion of his confession in which he described sharing a beer and a marijuana cigarette with the three girls at Waterdog Lake Park before the murder and his explanation that when he drinks alcohol and smokes marijuana, his body chemistry changes and he becomes assaultive. In fact, the trial court considered that evidence and concluded it did not establish that defendant was intoxicated within the meaning of section 190.3, factor (h) at the time of the offenses: "The girls who talked to Jon Dunkle before he attacked Lance Turner saw the defendant with one can of beer. They reported no symptoms of intoxication. The defendant himself did not say that he was intoxicated when he saw Lance Turner on the path and decided to kill him. [¶] Perhaps the most persuasive evidence on this point is the careful planning of these murders by the defendant, which was mentioned by the court earlier. Such planning is inconsistent with intoxication."

Defendant criticizes the trial court's further statement that "Jon Dunkle also told the police that on the night he killed John Davies he had been drinking and smoking marijuana. However, the defendant did not indicate that he was high when he committed the murder." Defendant complains that the trial court overlooked substantial evidence to the contrary, namely his statement to Belmont police that he was drunk and had been drinking whisky and smoking marijuana that night, and his statement to the FBI attributing the Davies murder to the effects of drink. The court's ruling, however, makes clear that it considered the evidence defendant cites, and simply did not accord it substantial mitigating weight.

Defendant contends the trial court erred in finding premeditation and deliberation in the Davies and Turner homicides because they were carefully planned, and "such planning is inconsistent with intoxication." In addition to arguing that the evidence in this case fails to show careful planning, defendant argues that premeditation and deliberation may be affected by intoxication, and that evidence of diminished capacity due to intoxication or mental defect, whether or not it rises to the level of a diminished capacity defense, is still a mitigating factor in capital sentencing. We do not infer the trial court overlooked relevant evidence or ignored applicable law to which it referred elsewhere in its ruling. Rather, it simply accorded greater weight to what the Attorney General calls defendant's deliberate goal-oriented behavior at the time of the Davies and Turner killings.

Defendant criticizes the trial court's conclusion that defendant had threatened to use force or violence in the course of the Rennie burglary. As we concluded above, however (*ante*, at pp. 922–923), the trial court properly could consider the evidence of that incident under section 190.3, factor (b). Defendant further argues the trial court improperly considered the fact that he resisted arrest and used force against Sergeant Goulart of the Belmont Police Department when the latter thwarted the Rennie burglary. Defendant notes that the prosecution never gave pretrial notice of an intent to use that fact, and never argued it as a circumstance in aggravation. But defendant cites no authority precluding the trial court, in ruling on an automatic application under section 190.4, subdivision (e), from relying on a factual aspect of a factor (b) offense that was presented to the jury merely because the prosecution did not explicitly argue it in aggravation.

Defendant contends the trial court improperly concluded that he "delight[ed] in doing evil" and had "systematically feigned mental problems in order to avoid responsibility for his vicious acts." He admits there is evidence he sometimes produced or exaggerated symptoms of a mental illness he actually had, but—noting he confessed to his crimes—he argues there is no evidence he faked mental illness in order to avoid the death penalty. He also asserts the trial court improperly relied on evidence presented during the second competency trial. We disagree. As the Attorney General observes, at the penalty phase Dr. Missett testified defendant was malingering and Dr. Wilkinson testified defendant at times malingered and was manipulative. The trial court properly could consider this penalty phase evidence in ruling on the automatic application.

Defendant asserts the trial court erred in stating: "It was proven beyond a reasonable doubt that both during the murders and the legal proceedings the defendant knew right from wrong, and has always had the ability to make choices and maintain control of himself when he wishes to do so." Defendant

points out that in the second competency trial (which the trial court could not properly consider in ruling on the automatic application), the jury made no finding under the beyond a reasonable doubt standard and no finding regarding his knowledge of right from wrong or his ability to control himself, nor were the latter issues relevant to the guilt phase. The Attorney General interprets the trial court's comment as referring to the lack of evidence showing that defendant was psychotic at the time of the murders or incompetent at the time of trial. Whether or not that interpretation is correct, we agree with the Attorney General that even if the trial court misapprehended the appropriate standard or improperly considered evidence from the second competency trial, defendant fails to show a reasonable possibility any such error might have affected its ruling on the automatic application. (*People v. Clark* (1992) 3 Cal.4th 41, 172 [10 Cal.Rptr.2d 554, 833 P.2d 561].)

Defendant contends the trial court erred in stating, as relevant to section 190.3, factor (d): "There is no evidence that the murders of John Davies and Lance Turner were committed while the defendant was under the influence of extreme mental or emotional disturbance. Even the doctors most favorable to the defendant testified that Jon Dunkle showed no signs of mental illness until 1987." He cites Dr. Missett's testimony that he was "certainly prepared to admit that there are aspects of [defendant's] personality or motivations or intention that may be beyond his control. . . ."

But defendant takes Dr. Missett's testimony out of context. Before making the quoted comment, Dr. Missett stated that "the principal way in which [defendant] presents himself and the principal characteristic of his acts, involves intentionality, involves awareness of what you are doing, involves awareness and disregard of consequences, and it involves things that are under his control." Dr. Missett went on to say: "But the actions themselves, and the amount of devious planning that goes into them, . . . those are under his control." Dr. Wilkinson, testifying on defendant's behalf during the penalty phase, said that in reviewing the police reports relevant to the case he saw no symptoms of mental illness that led him to believe it was a "dominant explanation" for the crimes. The trial court did not err in not treating defendant's statement to police that he develops assaultive behavior after drinking alcohol or smoking marijuana as weighty evidence of extreme mental or emotional disturbance within the meaning of section 190.3, factor (d).

Finally, defendant complains that nothing in the court's ruling suggests it took into consideration the sole penalty phase defense proffered by counsel: current mental illness. To the contrary, in its discussion of section 190.3, factor (k), the court stated: "There was presented no circumstance which could extenuate the gravity of the crimes for which the defendant was

convicted. Nothing the defendant has presented regarding his personal history, which includes a learning disability, constitutes a basis for a sentence less than death. Nothing in the defendant's background excuses, explains or mitigates the violence and the brutality surrounding the murders of John Davies and Lance Turner. [¶] Evidence that the defend[ant] was influenced by alcohol or drug consumption or schizophrenia at the time of the homicide is not convincing. Jon Dunkle's conduct during the commission of each murder was deliberate and purposeful. It was proven beyond a reasonable doubt that *both during the murders and the legal proceedings the defendant knew right from wrong, and has always had the ability to make choices and maintain control of himself when he wishes to do so.*" (Italics added.) The trial court considered, but evidently accorded little weight to, defendant's evidence of current mental illness.

In sum, in ruling on the automatic application to modify the verdict the trial court made no factual errors sufficient to undermine the validity of its conclusion.

### e. *Effect of guilt and penalty phase errors*

Defendant contends the trial court's ruling on the automatic application for modification of the verdict was prejudicially affected by errors it committed during the guilt and penalty phases of the trial, considered individually and cumulatively. He fails, however, to show how any error may have done so, and we reject the point.

### f. *Cumulative error in proceedings on automatic application*

Defendant contends that errors in the proceedings under section 190.4, subdivision (e) should be reviewed for their cumulative effect and the judgment should be reversed accordingly. We have found no error that, individually or cumulatively, demonstrates that the trial court failed to accord him proper review under section 190.4, subdivision (e) of the jury's sentencing decision.

### 4. *Cumulative penalty phase error*

Defendant argues that errors occurring in the penalty phase of his trial, considered cumulatively, require reversal of the death judgment. Because we have found no error in this phase of the trial, however, the contention must fail.

### 5. *Asserted unconstitutionality of death penalty law*

Defendant contends that many features of this state's capital sentencing law, alone or in combination with each other, violate the federal Constitution. He acknowledges we have rejected these contentions in other cases.

■ Thus, we have held the inclusion in the list of mitigating factors of such adjectives as "extreme" (see section 190.3, factor (d); CALJIC No. 8.85) does not act as a barrier to the jury's consideration of mitigating evidence in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments (*People v. Monterroso* (2004) 34 Cal.4th 743, 796 [22 Cal.Rptr.3d 1, 101 P.3d 956]), nor does it render such factors unconstitutionally vague, arbitrary, capricious or incapable of principled application (*People v. Yeoman* (2003) 31 Cal.4th 93, 165 [2 Cal.Rptr.3d 186, 72 P.3d 1166]; *People v. Stanley, supra*, 10 Cal.4th 764, 842).

■ California's death penalty law does not fail to perform the constitutionally required narrowing function by virtue of the number of special circumstances or the manner in which they have been construed. (*People v. Morrison* (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568].)

■ The law does not deprive defendant of meaningful appellate review and federal due process and Eighth Amendment rights by failing to require written or other specific findings by the jury on the aggravating factors it applies. (*People v. Smith* (2003) 30 Cal.4th 581, 641–642 [134 Cal.Rptr.2d 1, 68 P.3d 302].)

■ The death penalty law does not violate the Fourteenth Amendment's due process clause by failing to require that all aggravating factors be proved beyond a reasonable doubt, that aggravation must outweigh mitigation beyond a reasonable doubt, and that death is the appropriate penalty beyond a reasonable doubt. (*People v. Snow* (2003) 30 Cal.4th 43, 126 [132 Cal.Rptr.2d 271, 65 P.3d 749].) Indeed, the sentencing law is not unconstitutional, and does not violate Evidence Code section 520, in requiring no burden of proof as to penalty because the capital sentencing function is not susceptible of a burden of proof quantification. (*People v. Brown* (2004) 33 Cal.4th 382, 401 [15 Cal.Rptr.3d 624, 93 P.3d 244]; *People v. Lenart* (2004) 32 Cal.4th 1107, 1136 [12 Cal.Rptr.3d 592, 88 P.3d 498].) We find no merit in defendant's alternative contention that CALJIC No. 8.84 was deficient because it did not expressly inform the jury that no party bore the burden of proof; taken as a whole, the instructions accurately advised the jury concerning the process of penalty determination, and more was not required.

■ The jury's unanimous agreement on aggravating factors is not required. (*People v. Medina* (1995) 11 Cal.4th 694, 782 [47 Cal.Rptr.2d 165, 906 P.2d 2].)

That the death penalty law permits consideration of unadjudicated criminal activity does not render it unconstitutional. (*People v. Kraft* (2000) 23 Cal.4th 978, 1078 [99 Cal.Rptr.2d 1, 5 P.3d 68].)

The existence of prosecutorial discretion whether to seek the death penalty in a given case does not render the law unconstitutional. (*People v. Kraft, supra,* 23 Cal.4th at p. 1078.)

California's death penalty law is not unconstitutional because of a claim that the use of the death penalty as a regular form of punishment falls short of international norms of human decency. (*People v. Brown, supra,* 33 Cal.4th at pp. 403–404.)

The terms "aggravating" and "mitigating" are commonly understood words that we have held need not be further defined for the jury (*People v. Hawkins* (1995) 10 Cal.4th 920, 965 [42 Cal.Rptr.2d 636, 897 P.2d 574], disapproved on other grounds in *People v. Lasko* (2000) 23 Cal.4th 101, 110 [96 Cal.Rptr.2d 441, 999 P.2d 666]); it follows they are not unconstitutionally vague.

The trial court was not required to instruct the jury that a sentence of life imprisonment without possibility of parole means that a defendant will never be paroled. (*People v. Arias* (1996) 13 Cal.4th 92, 172 [51 Cal.Rptr.2d 770, 913 P.2d 980].)

The trial court also was not required to instruct the jury on a " ' "presumption of life." ' " (*People v. Combs* (2004) 34 Cal.4th 821, 868 [22 Cal.Rptr.3d 61, 101 P.3d 1007].)

Intercase proportionality review is not constitutionally required. (*People v. Horning* (2004) 34 Cal.4th 871, 913 [22 Cal.Rptr.3d 305, 102 P.3d 228].) Nor does equal protection require that capital defendants be afforded the same sentence review afforded other felons under the determinate sentencing law. (*People v. Morrison, supra,* 34 Cal.4th at p. 731.)

The death penalty does not constitute cruel and unusual punishment, nor does the existence of procedural "barriers" to state or federal postconviction remedies violate the Eighth and Fourteenth Amendments. (*People v. Staten* (2000) 24 Cal.4th 434, 462 [101 Cal.Rptr.2d 213, 11 P.3d 968]; *People v. Fairbank* (1997) 16 Cal.4th 1223, 1255 [69 Cal.Rptr.2d 784, 947 P.2d 1321].)

 The administration of the death penalty in this state is not unconstitutionally arbitrary. (*People v. Snow, supra*, 30 Cal.4th at p. 127.)

Defendant offers no persuasive reason to depart from these precedents.

### 6. *Asserted unconstitutionality of method of execution*

Defendant observes that the method of execution prescribed by the 1990 judgment in this case, the administration of lethal gas, has been held to violate the Eighth and Fourteenth Amendments. (*Fierro v. Gomez* (9th Cir. 1996) 77 F.3d 301, 309, vacated for reconsideration in light of statutory amendment (1996) 519 U.S. 918 [136 L.Ed.2d 204, 117 S.Ct. 285].) He contends his sentence should be reduced to life imprisonment without the possibility of parole because the 1992 amendment to section 3604 to permit execution by lethal injection as an alternative to lethal gas (Stats. 1992, ch. 558, § 2, p. 2075) would constitute an unconstitutional ex post facto law or bill of attainder as applied to him. We have previously rejected the same contention, reasoning the amendment did not increase or make more burdensome in any way a condemned prisoner's punishment. (*People v. Snow, supra*, 30 Cal.4th at pp. 127–128.) We see no reason to depart from that holding. For the same reason, defendant's claim that execution by lethal injection would place him a second time in jeopardy in violation of the Fifth and Fourteenth Amendments lacks merit. Defendant further argues that execution by lethal injection itself violates the Eighth and Fourteenth Amendments. As he acknowledges, we have held to the contrary (*People v. Samayoa* (1997) 15 Cal.4th 795, 864 [64 Cal.Rptr.2d 400, 938 P.2d 2]), and defendant advances no persuasive reason to reconsider that conclusion.

### 7. *Election of method of execution*

Defendant asks that, if this court affirms his sentence, counsel with expertise in matters pertaining to execution be appointed to advise him on the issue of the method of his execution. He reasons that the election between lethal gas and lethal injection, under section 3604, is a critical stage of the proceedings during which he is constitutionally entitled to representation. (See *Mempa v. Rhay, supra*, 389 U.S. at pp. 134–137 [holding the right to counsel applies at the time of imposition of sentence following revocation of probation or deferred sentencing].)

Assuming defendant is correct that he is entitled to the advice of counsel before making the section 3604 election, we conclude that to appoint counsel at this juncture, well before the setting of any execution date, would be premature.

Defendant further contends that any valid election of a method of execution under section 3604 presupposes that the prisoner is competent to make such an election. (See *Ford v. Wainwright* (1986) 477 U.S. 399, 410 [91 L.Ed.2d 335, 106 S.Ct. 2595] [barring execution of the insane].) Accordingly, he asks for a determination of his competency for that purpose. Like the appointment of counsel to advise defendant on the section 3604 election, a determination of his competency for this purpose at this time would be premature.

### 8. *Delay in appellate process and execution of sentence*

Observing that the judgment in this case was entered in 1990, appellate counsel was appointed in 1993, and further delay has occurred in the process of briefing and adjudicating this appeal, defendant contends these circumstances support a presumption of excessive delay in violation of his right to due process of law and the Eighth and Fourteenth Amendments to the federal Constitution. Defendant also asserts that if he receives inferior treatment because of his indigence than a person who could afford counsel would have received, he has been denied equal protection of the laws. In support, he relies on *Harris v. Champion* (10th Cir. 1994) 15 F.3d 1538. We previously have distinguished that case, in which the federal court of appeals held that a two-year delay in disposing of noncapital criminal appeals is presumptively excessive, as "[not] address[ing] the unique demands of appellate representation in capital cases." (*People v. Holt, supra,* 15 Cal.4th 619, 709.) "[D]efendant fails to demonstrate that the delay inherent in the procedures by which California recruits, screens, and appoints attorneys to represent capital defendants on appeal, is not necessary to ensure that competent representation is available for indigent capital appellants." (*Ibid.*) Moreover, although defendant complains that long delay renders a retrial more difficult and complicated, he "fails to suggest any impact that the delay could have on the validity of the judgment rendered before that delay occurred." (*Ibid.*)

Finally, defendant argues that the long delay between the imposition and execution of the death sentence constitutes cruel and unusual punishment. He acknowledges we have previously rejected this contention (*People v. Anderson, supra,* 25 Cal.4th at p. 606; *People v. Massie* (1998) 19 Cal.4th 550, 574 [79 Cal.Rptr.2d 816, 967 P.2d 29]), but asks us to reconsider our view. For the reasons stated in our earlier decisions, we decline to do so.

## DISPOSITION

The judgment is affirmed.

George, C. J., Baxter, J., Werdegar, J., Chin, J., and Moreno, J., concurred.

Appellant's petition for a rehearing was denied September 21, 2005. George, C. J., did not participate therein.